# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
### ATHENS DIVISION

| | |
|---|---|
| **MIRANDA WHITWORTH,** <br><br>     *Plaintiff,* <br><br> **v.** <br><br> **Officer JOHNATHON CHAMBERS,** *in his individual capacity*; **Officer DANNY WOODS** *in his individual capacity*; **and JESSE ELDER,** *in his individual capacity*, <br><br>     *Defendants.* | **CIVIL ACTION NO.** <br> **3:25-cv-00138-TES** |

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS AND ORDER TO SHOW CAUSE

Before the Court is Officer Johnathon Tyler Chambers and Officer Danny Bryan Woods' Motion to Dismiss [Doc. 31] the claims Plaintiff Miranda Whitworth asserts against them in her Amended Complaint [Doc. 27]. Since the instant motion is asserted pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court pulls the facts from Plaintiff's Amended Complaint and accepts them as true. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). At the very outset of her Response [Doc. 32], Plaintiff argues that Officer Chambers and Officer Woods "rely on selective readings" of her Amended Complaint, "mischaracterizations of the timeline, and premature assertions of qualified immunity." [Doc. 32, p. 1]. With that, so as not to misconstrue a thing, the vast majority of the forthcoming Factual Background is mostly comprised of language quoted

directly from Plaintiff's Amended Complaint—exactly as she phrased it. To be frank, her allegations as presented are, at times, chronological chaos, but the Court has done its best to organize her allegations into—what it hopes—is an easy-to-follow timeline.

## LEGAL STANDARD

Rule 12(b)(6) must be read in conjunction with the pleading rules set forth in Rule 8, which requires a pleading to "contain a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Supreme Court reads Rule 8(a)(2) to require that a complaint "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). The plausibility standard is not analogous to a "probability requirement," but it does require more than a sheer possibility that a defendant has acted unlawfully. *Twombly*, 550 U.S. at 556. A claim is plausible when "the pleaded factual content allows [a] court to draw a reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. While the facts need not be detailed, they must "raise a reasonable expectation that discovery will reveal evidence" in favor of the plaintiff's claim. *Twombly*, 550 U.S. at 556. The issue to be decided on a Rule 12(b)(6) posture is a limited one: it's not whether the plaintiff will win her case but whether she has provided enough information to "unlock the doors of discovery." *Iqbal*, 556 U.S. at 678–79; *see also Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other grounds by Davis v. Scheuer*, 468 U.S. 183 (1984).

Whether a plaintiff can survive a Rule 12(b)(6)-based motion is "a content-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (citations omitted). If the plaintiff only alleges "unadorned, the-defendant-unlawfully-harmed-me-accusations," she does not have enough to proceed to discovery. *Id.* at 678 (citations omitted). Further, "labels, conclusions, and a formulaic recitation of the elements of a cause of action" alone are likewise insufficient because every legal conclusion pled must be supported by factual allegations. *Id.* at 678–79 (citations omitted). If there aren't enough factual allegations to raise a reasonable expectation of relief, dismissal is warranted under Rule 12(b)(6). *See Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level[.]").

To decide whether a complaint survives a motion to dismiss, courts use a two-step framework. *McCullough v. Finley*, 907 F.3d 1324, 1333 (11th Cir. 2018) (citation omitted). The first step is to identify the allegations that are "no more than conclusions." *Id.* (quoting *Iqbal*, 556 U.S. at 679). "Conclusory allegations are not entitled to the assumption of truth." *Id.* After disregarding the conclusory allegations, the second step is to "assume any remaining factual allegations are true and determine whether those factual allegations 'plausibly give rise to an entitlement to relief.'" *Id.* "A court decides whether [Rule 8's pleading standard] is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual

allegations, and then determining whether those allegations allow [it] to reasonably infer that the plaintiff [may be] entitled to the legal remedy sought." *Barreth v. Reyes 1, Inc.*, No. 5:19-cv-00320-TES, 2020 WL 4370137, at *2 (M.D. Ga. July 29, 2020).

Again, "even if doubtful in fact," the Court must follow the cardinal rule of accepting the facts as alleged in a complaint as true. *Twombly*, 550 U.S. at 555, 572; *Iqbal*, 556 U.S. at 678. In accepting the factual allegations as true, courts are to construe the reasonable inferences from them in the light most favorable to the plaintiff. *See Andre v. Clayton Cnty., Ga.*, 148 F.4th 1282, 1291 (11th Cir. 2025). "But where the well-pleaded facts do not permit [a] court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)). Lastly, the Court will "not consider anything beyond the face of the complaint . . . when analyzing a motion to dismiss." *Fin. Sec. Assurance, Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1284 (11th Cir. 2007) (citing *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1368 (11th Cir. 1997)).

In a pro se action, the Court must also construe a complaint more liberally than it would pleadings drafted by lawyers. *Hughes v. Rowe*, 449 U.S. 5, 9 (1980); *Hughes v. Lott*, 350 F.3d 1157, 1160 (11th Cir. 2003). Even though the impending Factual Background is chock full of quotes from Plaintiff's Amended Complaint, the Court is still, of course, cognizant of the leniency she's afforded when it comes to alleging facts. That said, pro se litigants are not exempt from complying with the Federal Rules of Civil Procedure,

4

including Rule 8(a)(2)'s pleading standard. *GJR Invs., Inc. v. Cnty. of Escambia*, 132 F.3d 1359, 1369 (11th Cir. 1998) ("Yet[,] even in the case of pro se litigants[,] this leniency does not give a court license to serve as de facto counsel for a party . . . or to rewrite an otherwise deficient pleading in order to sustain an action[.]" (internal citations omitted)), *overruled on other grounds as recognized in Randall v. Scott*, 610 F.3d 701, 706 (11th Cir. 2010); *see also Moon v. Newsome*, 863 F.2d 835, 837 (11th Cir. 1989) (stating that pro se litigants are "subject to the relevant law and rules of court, including the Federal Rules of Civil Procedure").

## **FACTUAL BACKGROUND**

In her Amended Complaint, Plaintiff alleges that around 6:20 in the evening on October 10, 2023, she and her cousin, Mia Turner, stopped at a boat dealership in Franklin County, Georgia, "due to Mia's vehicle overheating." [Doc. 27, p. 3]. While Mia "poured water into [*sic*] the engine," an employee from N&C Marine, Defendant Jesse Len Elder, who Plaintiff alleges is a private citizen who "had previously worked for law enforcement," "approached [Mia] and questioned her actions."[1] [*Id.* at pp. 3, 5, 10]. "Mia explained the issue, apologized, and stated they were leaving." [*Id.* at p. 3].

Although Plaintiff doesn't say when, at some point, Officer Chambers arrived at N&C Marine, asked Mia for her driver's license, and instructed her to step to the rear of

---

[1] Defendant Elder is not a movant in the pending motion to dismiss.

her vehicle. [*Id.* at p. 4]. Plaintiff alleges that Officer Chambers put in his incident report that he asked Mia to step to the rear of her vehicle "with the intent of gaining consent to search [it]." [*Id.*]. The only question he asked her, according to Plaintiff, was the name of her passenger. [*Id.*]. Mia told Officer Chambers that the passenger was "[her] cousin[,] Miranda." [*Id.*]. Officer Chambers then made his way to Plaintiff's side of the vehicle and asked for her identification. [*Id.*]. As she "went to retrieve it, Officer Chambers opened the door and told her to exit the vehicle." [*Id.*]. Stating that she "had not committed a crime," Plaintiff asked Officer Chambers why she needed to get out. [*Id.*]. He told her if she didn't, he'd "pull her from the vehicle and charge her with obstruction." [*Id.*].

With her identification in her hand, Plaintiff says Officer Chambers pulled her from the vehicle and pinned her against it "with her left arm behind her back to apply handcuffs." [*Id.*]. While Officer Chambers worked to place Plaintiff in handcuffs," she claims, "[a]t that moment," Defendant Elder "rushed over," and Officer Chambers "allowed" Defendant Elder to forcefully twist and squeeze Plaintiff's right arm up behind her back "as high as possible." [*Id.* at pp. 4, 10]. While forcing Plaintiff's right arm behind her back, she also claims that Defendant Elder yelled in her face to "do what she was told." [*Id.*]. "[D]ue to the sudden pain and trauma," Plaintiff says she "involuntar[ily] urinat[ed]." [*Id.*]. Through all of this, Plaintiff consistently alleges that she "was not resisting or attempting to flee." [*Id.* at pp. 5, 10]. Officer Chambers then

picked up Plaintiff's identification "from the ground where it had fallen in her urine." [*Id.* at p. 4]. She claims that Officer Chambers did not intervene while Defendant Elder held her in this position or "take any action afterward." [*Id.* at p. 10]. Officer Chambers then placed Plaintiff in his patrol car and informed her she "was being charged with obstruction." [*Id.*].

When Officer Woods arrived on the scene, Officer Chambers told him that he "had the one from McDonald's in the back of his [patrol] car" and that they had "consent to search [Mia's] vehicle, but not [Plaintiff's] bags." [*Id.* at pp. 5, 8]. For a bit of context, the Court pauses to note that the "McDonald's [I]ncident" refers to events alleged in another one of Plaintiff's lawsuits involving her and these same two deputies. [*Id.*]; *see* Complaint, *Whitworth v. Franklin Cnty. Det. Ctr. ("Whitworth I")*, 3:25-cv-00106-TES (M.D. Ga. June 27, 2025), Dkt. No. 1. So, what is the McDonald's Incident?

In *Whitworth I*, Plaintiff alleged that around 1:00 A.M. on June 24, 2023, while she "was parked at [a] McDonald's," in Lavonia, Georgia, "waiting for a food order," Officer Chambers approached her vehicle to conduct a welfare check. *Whitworth I*, Dkt. No. 1, p. 4. Although Plaintiff informed Officer Chambers that she was fine, he ordered her to exit her vehicle. *Id.* When she asked why, Officer Chambers then allegedly threatened to arrest her for obstruction. *Id.* Plaintiff requested a supervisor, and Officer Chambers agreed to allow her to remain in the vehicle until the supervisor arrived. *Id.* However, when Officer Woods arrived, he and Officer Chambers forcibly removed

7

Plaintiff from her vehicle and, even though she was noncombative, she claims they threw her to the ground, injuring her back. *Id.* at pp. 4, 6. The Court dismissed that case on August 26, 2025. *See generally* Order, *Whitworth I*, Dkt. No. 5; *see also Whitworth v. Franklin Cnty. Det. Ctr.*, No 3:25-cv-00106-TES, 2025 WL 2466104 (M.D. Ga. Aug. 26, 2025). Specifically, the Court dismissed Plaintiff's federal claims as time-barred by the applicable statute of limitations. Order, *Whitworth I*, Dkt. No. 5, pp. 1–6. Then, as for her state law claims, the Court declined to exercise supplemental jurisdiction and dismissed them without prejudice. *Id.* at pp. 6–8. Plaintiff says she filed a written complaint to the Franklin County Sheriff regarding the McDonald's Incident on September 25, 2023, just 15 days before the N&C Marine Incident. [Doc. 27, pp. 8–9]. In both incidents, Plaintiff claims she "was sitting in a parked vehicle," "threatened with arrest for obstruction," and "removed from the vehicle very quickly." [*Id.* at p. 9].

Now, back to the facts surrounding the N&C Marine Incident. During his search of the vehicle, Plaintiff alleges that Officer Woods stated he "found a pill bottle containing a bag of methamphetamine." [*Id.* at p. 6]. Based on that, Officer Chambers then went to his patrol car and told Plaintiff that Officer Woods' discovery of methamphetamine "gave him probable cause to search her belongings." [*Id.*]. "At that moment," Plaintiff alleges "Officer Woods and Mia . . . walked up and confirmed that the bottle *did not* contain methamphetamine or [even] a bag"—but merely "residue" from Mia's prescription medication. [*Id.* (emphasis added)]. According to Plaintiff, this

8

"eliminated any probable cause that Officer Chambers had claimed for searching [her] belongings." [*Id.*]. She also claims that "even though it was determined on the scene" that there wasn't any methamphetamine present, Officer Chambers noted in his incident report "that a bag of methamphetamine was found." [*Id.*]. Despite having found what was supposedly prescription medication residue, Plaintiff claims that Officer Chambers and Officer Woods "returned to [Mia's] vehicle *and* began searching [Plaintiff's] belongings." [*Id.* (emphasis added)].

Once uncuffed and released from Officer Chambers' patrol car, Mia "immediately drove [Plaintiff] home" where her family observed extensive bruising on her arms and visible swelling on her neck. [*Id.* at pp. 4–5, 10]. In addition to these alleged injuries, Plaintiff says her family noticed that she "looked dazed, seemed confused, appeared withdrawn, and [was] not acting normally." [*Id.* at p. 5]. Scans from a hospital visit allegedly showed a sprained neck, but the swelling "prevented a complete assessment of additional injuries." [*Id.*].

According to her Amended Complaint, Plaintiff claims "hospital staff reported the matter" to an investigator from the Franklin County Sheriff's Office. [*Id.* at p. 6]. The investigator apparently contacted Plaintiff to inform her that he needed a statement from her and Mia because a conduct investigation "was being opened for Officer Chambers and Officer Woods." [*Id.* at pp. 6, 10]. The investigator allegedly told Plaintiff that "once he gathered all evidence, he would forward it to the District Attorney." [*Id.* at

p. 7]. Until the investigator wrapped his investigation, though, Plaintiff "was informed that she could not have access to any body-cam footage." [*Id.*].

"In the following months," Plaintiff claims she "repeatedly contacted" the District Attorney's Office, but "when she finally received a response, she was told that it was not what she thought it was" and that the District Attorney's Office "does not handle that type of case." [*Id.*]. Nevertheless, "Plaintiff was able to obtain the video footage a year and a half later." [*Id.* at pp. 7, 10]. Upon "learning the [investigation] had been closed with no action taken against Officer Chambers, Officer Woods, or [Defendant] Elder," Plaintiff "filed a criminal complaint against [Defendant] Elder for battery and submitted a sworn statement" to the Sheriff's Office. [*Id.* at p. 7]. In total, Plaintiff filed two complaints "with the Franklin County Detention Center": one regarding the N&C Marine Incident and one regarding the McDonald's Incident. [*Id.* at p. 8]. Neither, however, "received [any] response, follow up, or additional information." [*Id.*]. According to Plaintiff, though, body-cam footage would show that "Officer Woods asked Officer Chambers if he was going to take Plaintiff to jail" and that Officer Chambers "responded no because to his knowledge . . . Plaintiff had spoken and complained to the Sheriff several times already." [*Id.*]. Following the McDonald's Incident, Plaintiff claims she "was charged with two counts of obstruction," and with respect to the N&C Marine Incident, she claims she "was also threatened with obstruction, detained, [and] released, but later learned that she had been charged with

10

obstruction" for the N&C Marine Incident as well. [*Id.* at pp. 9–10].

"About a week" after filing her complaint regarding the N&C Marine Incident, Plaintiff says "when [she] returned to obtain a copy of her report," "as instructed," "she was informed that the report could not be located" and "that she had a warrant for obstruction" from the events that transpired on October 10, 2023. [*Id.* at pp. 7, 10]. In her Amended Complaint, she claims that although "she had never been notified or served" with the warrant, she "was arrested on that charge." [*Id.* at p. 7]. Plaintiff also alleges a couple of facts about a pre-warrant hearing. [*Id.*]. She claims, at that hearing, "Officer Chambers testified that he needed [Defendant] Elder['s] help to restrain Plaintiff, and the judge denied the battery charge based on [Officer] Chambers['] testimony." [*Id.*]. As a result of what allegedly happened on October 10, 2023, Plaintiff asserts the following claims against Officer Chambers, Officer Woods, and Defendant Elder.

## PLAINTIFF'S CLAIMS

### 1.    Plaintiff's Alleged Constitutional Violations

The exclusive means for bringing a suit for damages in federal court for a constitutional violation is pursuant to 42 U.S.C. § 1983. The statute itself "is not . . . a source of substantive rights," and it merely provides "a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979); *Wideman v. Shallowford Cmty. Hosp., Inc.*, 826 F.2d 1030, 1032 (11th Cir. 1987). To state a claim for

11

relief under § 1983, a plaintiff must allege that an act or omission deprived her of a right, privilege, or immunity secured by the Constitution or a statute of the United States and that the act or omission was committed by a person acting under color of state law. *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579, 1582 (11th Cir. 1995). So, to employ § 1983 as a remedy for a deprivation of constitutional rights, a litigant must show that the alleged deprivation was committed by someone acting under the color of state law—by a state actor. *Id.* In her Amended Complaint, Plaintiff asserts First, Fourth, and Fourteenth Amendment violations pursuant to § 1983 as follows. [Doc. 27, pp. 3, 5–6, 8].

In Count One, citing the Fourth Amendment, she asserts a claim for unlawful seizure and excessive force against Officer Chambers. [*Id.* at p. 3]. As pled, Count One asserts Fourth Amendment-based unlawful seizure and excessive force claims against Officer Chambers *and* Defendant Elder, but since Defendant Elder is not a movant to the pending dismissal motion, the Court parses these claims into two counts. [*Id.*]. Thus, like Count One, Count Two asserts Fourth Amendment-based claims for unlawful seizure and excessive force. [*Id.*]. Count Two, though, is now only against nonmovant Defendant Elder whom Plaintiff contends "had no authority to restrain her." [*Id.* at p. 5]. In support of Count One and Count Two, Plaintiff alleges that Officer Chambers and Defendant Elder's actions, "including forcibly removing her from the vehicle, physically restraining her, and placing her in handcuffs, were unnecessary and excessive under the circumstances" since she "was not resisting or attempting to flee." [*Id.* at pp. 5, 10].

Next, in Count Three, Plaintiff claims Officer Chambers and Officer Woods violated the Fourth Amendment when they "conduct[ed] an unreasonable search of her personal belongings without her consent or valid probable [cause]." [*Id.* at pp. 5–6]. Plaintiff claims that although Mia consented to the search of *her* own vehicle, Plaintiff did not—despite his request—give Officer Chambers consent to search her bags. [*Id.* at p. 5]. In Count Four, Plaintiff asserts that Officer Chambers violated due process protections secured by the Fourteenth Amendment because she "was never notified of the obstruction warrant, never informed of the status of the [conduct] investigation, and was unable to address or respond to the charges before being arrested." [*Id.* at pp. 6–7]. Then, in Count Five, Plaintiff asserts a retaliation claim under the First Amendment against Officer Chambers and Officer Woods. [*Id.* at p. 8]. There, she alleges "her rights under the First Amendment were violated because she engaged in protected activity by filing complaints against Officer Chambers and Officer Woods."[2] [*Id.*]. Activity, Plaintiff

---

[2] The "protected activity" mentioned here necessarily must refer to the written complaint Plaintiff alleges she made to the Sheriff on September 25, 2023, regarding the McDonald's Incident from June 24, 2023. [Doc. 27, pp. 8–9]. Which was, if you recall, just 15 days before the N&C Marine Incident. [*Id.*]. Thus, the protected activity Plaintiff alleges Officer Chambers and Officer Woods "were aware of" could not have been a "complaint" used to commence a lawsuit since she didn't file her first lawsuit against these two deputies until June 27, 2025. *See* Complaint, *Whitworth I*, No. 3:25-cv-00106-TES (M.D. Ga. June 27, 2025), Dkt. No. 1; *see also* [Doc. 1, p. 7 ("Plaintiff previously filed complaints against Officer Chambers and Officer Woods regarding the [McDonald's] [I]ncident.")]. Thus, it cannot be that Plaintiff's previous lawsuit against Officer Chambers and Officer Woods supplies the basis for her § 1983 retaliation claims because she had not filed it as of October 10, 2023—the date of the N&C Marine Incident. *See* Complaint, *Whitworth I*, Dkt. No. 1; *see also* Complaint, *Whitworth v. St. Mary's Sacred Heart Hosp.*, No. 3:25-cv-00108-TES (M.D. Ga. June 30, 2025), Dkt. No. 1. To be clear, the Court previously discussed this tidbit in its Order Directing Service [Doc. 3], but it wanted to make double sure that it, in no way, is implying that Plaintiff tried to use a *lawsuit* to support her retaliation claims. [Doc. 3, p. 10].

alleges, they were both aware of. [*Id.*].

### 2.    Plaintiff's State Law Claims

Under state law, Plaintiff asserts a laundry list of claims. [*Id.* at pp. 8–9]. In Count

Six and Count Seven, respectively, she asserts battery and assault claims against

Defendant Elder. [*Id.*]. To support her battery claim (O.C.G.A. § 16-5-23.1), she relies on

her allegation that Defendant Elder "applied force to [her] arm behind her back, causing

severe and permanent physical injury." [*Id.* at p. 8]. As for her assault claim, she states

that Defendant Elder's actions "caused [her] to reasonably fear further unlawful

physical contact." [*Id.* at p. 9]. In Count Eight, Plaintiff asserts a claim for false

imprisonment against Officer Chambers because he "detained [her] without lawful

justification." [*Id.*]. Next, Plaintiff asserts a claim for intentional infliction of emotional

distress ("IIED") against Officer Chambers, Officer Woods, and Defendant Elder on the

conclusory allegation that their "conduct caused [her] severe emotional distress." [*Id.*].

As it did with Count One, the Court parses Plaintiff's IIED claim into separate counts.

Thus, Count Nine consists of an IIED claim against Officer Chambers and Officer

Woods, and Count Ten now asserts an IIED claim against Defendant Elder.

In Count Eleven, Plaintiff asserts a negligence claim against Officer Chambers

based on her allegation that he "failed to intervene, prevent, or take corrective action

against [Defendant] Elder's conduct." [*Id.*]. And finally, in Count Twelve, Plaintiff

asserts a claim for malicious prosecution. [*Id.*]. However, for this claim, it's unclear

against whom Plaintiff asserts it. The claim merely rests on allegations that Plaintiff "was initially released and informed she was not being charged [with obstruction]" only to find out, "approximately a year and a half" after the fact, that "an obstruction warrant [had been] filed without her knowledge." [*Id.*].

By way of a roadmap, the Court addresses each of Plaintiff's claims, one by one, and in order, excluding, of course, her claims against Defendant Elder since he's not a movant in the motion before the Court. Put simply, only the following counts are subject to dismissal: Count One, Count Three, Count Four, Count Five, Count Eight, Count Nine, Count Eleven, and Count Twelve.

### FEDERAL CLAIMS

### 1.    Count One: Plaintiff's Fourth Amendment Claim Against Officer Chambers for Unlawful Seizure and Excessive Force

Something many fail to understand is that "[n]ot all deprivations of a right . . . are redressable." *Andre*, 148 F.4th at 1291. The doctrine of qualified immunity "offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* (quoting *Grider v. City of Auburn*, 618 F.3d 1240, 1254 (11th Cir. 2010)). Here, Plaintiff sues Officer Chambers and Officer Woods in their individual capacity. [Doc. 27, p. 2]. To phrase the protections of the doctrine a little differently, qualified immunity protects Officer Chambers and Officer Woods when

they act in the exercise of their discretionary duties *unless* Plaintiff can show they "committed a constitutional violation" that was "clearly established" in law at the time of the alleged misconduct. *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002); *Edger v. McCabe*, 84 F.4th 1230, 1235 (11th Cir. 2023). In response, Plaintiff argues qualified immunity does not warrant dismissal at the pleadings stage. [Doc. 32, p. 1]. That's incorrect. When appropriate, courts *can* grant qualified immunity at this stage. Doing so in this case, however, isn't warranted.

In their motion, Officer Chambers and Officer Woods contend that "Plaintiff challenges discretionary law-enforcement activity." [Doc. 31-1, p. 1]. While Plaintiff doesn't—nor could she—dispute that they were acting within the scope of their discretionary authority, she vehemently contends she "has plausibly alleged multiple violations of clearly established constitutional rights." [Doc. 32, p. 1]. When it comes to whether she plausibly alleges claims of unlawful seizure and excessive force, the Court agrees with Plaintiff. *See Andre*, 148 F.4th at 1292. Thus, the outcome of Officer Chambers' 12(b)(6)-based effort to dismiss Count One "turns on whether [he] violated clearly established Fourth Amendment law." *Green v. Surine*, No. 25-10817, 2026 WL 381376, at *3 (11th Cir. Feb. 11, 2026) (affirming protection of qualified immunity at summary judgment).

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S.

16

Const. amend. IV. "A person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that [s]he was not free to leave." *Andre*, 148 F.4th at 1292 (quoting *California v. Hodari D.*, 499 U.S. 621, 627–28 (1991)). In taking a slightly narrower tune towards the particular allegations in this case, for a person to be seized, her "'freedom of movement' must be restrained 'by means of physical force or a show of authority.'" *Id.* (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). "[T]he test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that [s]he was being ordered to restrict [her] movement, but whether the officer's words and actions would have conveyed that to a reasonable person." *Id.* (quoting *Hodari*, 499 U.S. at 628). In *Andre,* the Eleventh Circuit noted some "[e]xamples of circumstances that might indicate a seizure, even where the person," like Plaintiff alleges, "did not attempt to leave." *Id.* (quoting *Mendenhall*, 446 U.S. at 554); [Doc. 27, pp. 5, 10]. While certainly not exhaustive, it could be "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Andre,* 148 F.4th at 1292 (quoting *Mendenhall*, 446 U.S. at 554).

The Fourth Amendment's protection against unreasonable seizures also "encompasses the right to be free from excessive force during the course of a criminal

apprehension." U.S. Const. amend. IV; *Corbitt v. Vickers*, 929 F.3d 1304, 1315 (11th Cir. 2019) (quoting *Oliver v. Fiorino*, 586 F.3d 898, 905 (11th Cir. 2009)). To establish a Fourth Amendment claim for excessive force, a plaintiff must first allege that a seizure occurred and that the force used to effectuate the seizure was unreasonable. *Corbitt*, 929 F.3d at 1315 (quoting *Troupe v. Sarasota Cnty.*, 419 F.3d 1160, 1166 (11th Cir. 2005)). The test, like the one for whether a seizure is unlawful, is also an objective one. *Andre*, 148 F.4th at 1292 (quoting *Hodari*, 499 U.S. at 628); *Oliver*, 586 F.3d at 905. To determine whether the use of force is "objectively reasonable," courts "balance 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against 'the countervailing governmental interests at stake' under the facts of the particular case." *Oliver*, 586 F.3d at 905 (quoting *Graham v. Connor,* 490 U.S. 386, 388, 394–96 (1989)). Courts "measure the quantum of force employed against these factors—the severity of the crime at issue; whether the suspect poses an immediate threat to the safety of the officers or others; and whether the suspect actively resisted arrest or attempted to evade arrest by flight." *Id.* (quoting *Lee v. Ferraro,* 284 F.3d 1188, 1197–98 (11th Cir. 2002)).

The linchpin for these types of Fourth Amendment claims rests on whether actual probable cause or even arguable probable cause supported an officer's actions. *Green*, 2026 WL 381376, at 3 (citing *Skop v. City of Atlanta*, 485 F.3d 1130, 1137 (11th Cir. 2007)); *see also Brown v. City of Huntsville*, 608 F.3d 724, 734 (11th Cir. 2010). Seizures are unreasonable unless supported by either cause classification. *See Green*, 2026 381376, at

*3. "[W]hether an officer possesses either actual or arguable probable cause depends on the elements of the alleged crime and the operative fact pattern." *Id.* (quoting *Edger*, 84 F.4th at 1237).

The alleged crime in question in this case is, of course, obstruction. [Doc. 27, pp. 4, 7, 9–10]. "A knowing and willful refusal to provide identification to an officer acting in the lawful discharge of his official duties may constitute obstruction" under O.C.G.A. § 16-10-24(a). *Green*, 2026 WL 381376, at *3 (quoting *Brown v. GeorgiaCarry.org, Inc.*, 770 S.E.2d 56, 60 (Ga. Ct. App. 2015)). "[A] person who knowingly and willfully obstructs or hinders any law enforcement officer . . . in the lawful discharge of his or her official duties shall be guilty of a misdemeanor." O.C.G.A. § 16-10-24(a). In *Green*, the Eleventh Circuit ruled that officers had probable cause to make an arrest when an individual "refused to provide identification upon request." 2026 WL 381376, at *4.

Here, taking the factual allegations from Plaintiff's Amended Complaint as true, she didn't refuse to provide her identification to Officer Chambers. Quite plainly, Plaintiff alleges when Officer Chambers made his way to Plaintiff's side of Mia's vehicle and asked for her identification, she "*went to retrieve it*." [Doc. 27, p. 4 (emphasis added)]. Taking this as true, as the Court must, Plaintiff didn't refuse to provide her identification. *Twombly*, 550 U.S. at 555, 572. Further, in construing the reasonable inferences from Plaintiff's allegations in the light most favorable to her, *Andre*, 148 F.4th at 1291, it's highly plausible that after Officer Chambers asked Plaintiff for her

identification, she "went to retrieve it," and simultaneously questioned why she needed to exit the vehicle since, so she claims, "she had not committed a crime." [Doc. 27, p. 5]. In what could only be a matter of seconds, reasonable inferences from Plaintiff's allegations lend to the possibility that Officer Chambers yanked Plaintiff from the vehicle and pinned her against it even though she didn't refuse to provide her identification. [*Id.* at p. 9 (Plaintiff's allegation that she "was removed from the vehicle very quickly")]; *see also* [Doc. 32, p. 2 (Plaintiff's argument that she "was not given time to produce" her identification)]. Through the lens of accepting a plaintiff's well-pled factual allegations as true and construing them accordingly, it's not outside the realm of possibilities that Officer Chambers "pulled [Plaintiff] from the vehicle" while she was in the process of complying with his request. *Twombly*, 550 U.S. at 555, 572; *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1273 n.1 (11th Cir. 1999).

In a fairly recent decision from the Supreme Court, it stressed its repeated admonition telling "courts . . . not to define clearly established law at a high level of generality." *City of Escondido, Cal. v. Emmons*, 586 U.S. 38, 42 (2019) (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018)). "[T]he clearly established right must be defined with specificity." *Id.*

> Specificity is especially important in the Fourth Amendment context, where the [Supreme] Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. Use of excessive force is an area of the law in which the result depends very much on the

20

facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue . . . .

[I]t does not suffice for a court simply to state that an officer may not use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness. An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.

*Id.* at 42–43 (quoting *Kisela*, 584 U.S. at 104–05).

In what is oft-seen as hair-splitting analyses when it comes to determining whether something is clearly established, the Eleventh Circuit has recognized that a "[v]iolation of the Fourth Amendment requires an intentional acquisition of physical control." *Corbitt*, 929 F.3d at 1317 (quoting *Brower v. Cnty. of Inyo*, 489 U.S. 593, 596 (1989)). In short, "the Fourth Amendment addresses 'misuse of power[.]'" *Brower*, 489 U.S. at 596 (quoting *Byars v. United States*, 273 U.S. 28, 33 (1927)). Further, the Eleventh Circuit has explained "that unprovoked force against a non-hostile and non-violent suspect who has not disobeyed instructions" is unreasonable and, when accompanied by injury to the suspect, may "violate[ ] that suspect's rights under the Fourth Amendment." *Fils v. City of Aventura*, 647 F.3d 1272, 1289 (11th Cir. 2011).

Where, as *alleged* here, a plaintiff's crime is minor, she did not pose a threat to anyone, and there was no indication that she resisted arrest or attempted to flee, "[o]ther cases confirm that [the use of] extreme force to subdue" may be "plainly excessive, wholly unnecessary, and indeed, grossly disproportionate" when applying

21

the balancing test discussed above. *Id.*; *Oliver*, 586 F.3d at 905 (quoting *Graham*, 490 U.S. at 394–96); [Doc. 27, pp. 5, 10]. The facts the Court "must accept [allege] that [Plaintiff] was not violent." *Fils*, 647 F.3d at 1290. She did not disobey Officer Chambers' order to provide her identification. *See id.* She "did not resist arrest" or attempt to flee. *Id.* "And [she allegedly] posed no risk" to Officer Chambers.[3] *Id.*; [Doc. 27, pp. 5, 10].

Bound by the four corners of Plaintiff's Amended Complaint, the Court cannot say, at this early stage, that Officer Chambers is entitled to qualified immunity. *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009) ("A court's review on a motion to dismiss is 'limited to the four corners of the complaint.'"). Accordingly, his 12(b)(6)-based effort to have Plaintiff's Fourth Amendment claim for unlawful seizure and excessive force in Count One dismissed based on qualified immunity is **DENIED**. More than Plaintiff's automatically accepted factual allegations will be required to determine whether qualified immunity protects Officer Chambers on her claim for unlawful seizure and excessive force.

It goes without saying the Court would've really liked to have seen the footage from the body-cam Plaintiff so clearly alleges she was ultimately able to obtain. [Doc. 27, p. 7]. And, obviously, Officer Chambers and Officer Woods also had the opportunity

---

[3] While the Court accepts these allegations as true, it's interesting that in attempting to secure Defendant Elder as a state actor for purposes of § 1983 liability, Plaintiff also alleges "Officer Chambers testified that he needed" Defendant Elders' "help to restrain her." [Doc. 27, p. 7]. If Officer Chambers, in fact, *needed help* to restrain Plaintiff, her allegation that she "was not resisting" is specious at best. [*Id.* at p. 10]. That, though, is an issue for another day.

to place it on the record, but neither she nor they provided the video for the Court's consideration.

2.     **Count Three: Plaintiff's Fourth Amendment Claims Against Officer Chambers and Officer Woods for Unlawful Search and Seizure**

Given the Court's above discussion regarding what constitutes a seizure under the Fourth Amendment, the Court, in considering Count Three, only focuses on the relevant law concerning unlawful searches. The Fourth Amendment generally requires an officer to have a warrant supported by probable cause to search an individual's personal property. *See United States v. Wilson*, 979 F.3d 889, 910 (11th Cir. 2020). But this requirement is subject to several well-established exceptions—including the "automobile exception." The Supreme Court has held that the Fourth Amendment permits the warrantless search of a vehicle where it is "readily mobile" and "probable cause exists to believe [it] contains contraband." *Maryland v. Dyson*, 527 U.S. 465, 467 (1999); *Carroll v. United States*, 267 U.S. 132, 153–56 (1925) (upholding the warrantless search of vehicle that officers had probable cause to believe contained illegal liquor). "For purposes of the automobile exception, probable cause exists when 'there is a fair probability that contraband or evidence of a crime will be found in the vehicle under the totality of the circumstances.'" *Watkins v. Johnson*, 853 F. App'x 455, 462 (11th Cir. 2021) (quoting *United States v. Delva*, 922 F.3d 1228, 1243 (11th Cir. 2019)).

Further, a passenger in a private car, who has no possessory interest in the

23

vehicle, does not have a legitimate expectation of privacy in the interior of the automobile, and, therefore, cannot contest the vehicle's search on Fourth Amendment grounds. *See Rakas v. Illinois*, 439 U.S. 128, 140, 143 n.12, 148 (1978); *United States v. Dixon*, 901 F.3d 1322, 1338 (11th Cir. 2018) (reaffirming that passengers generally do not have standing to contest a search of the interior of the vehicle "because [they do] not have the right to exclude others from the car") (quoting *United States v. Lee*, 586 F.3d 859, 864 (11th Cir. 2009)). That said, however, passengers do have standing to challenge the search of their belongings that are located inside the vehicle. *United States v. Barber*, 777 F.3d 1303, 1305 (11th Cir. 2015) (ruling that a passenger in a vehicle has a reasonable expectation of privacy in his belongings, such as a bag).

Here, Mia allegedly gave her consent for Officer Chambers and Officer Woods to search her vehicle, but that's the extent of it. [Doc. 27, p. 5]. This is where it gets a little tricky. Mia gave consent for the search of *her* vehicle, and "[w]hile searching . . . Officer Woods stated that he found a pill bottle containing a bag of methamphetamine." [*Id.* at pp. 5–6]. Based off Officer Woods' supposed discovery of methamphetamine, Officer Chambers "told Plaintiff that this gave him probable cause to search her belongings." [*Id.* at p. 6]. He's right. This discovery would, of course, allow Officer Chambers and Officer Woods to engage in a constitutional, yet warrantless, search of "every part" of Mia's vehicle that might contain illegal substances. *See United States v. Ross*, 456 U.S. 798, 825 (1982) (holding that where probable cause justifies the search of a vehicle, "it

24

justifies the search of every part of the vehicle and its contents that may conceal the object to the search"). When probable cause exists, it makes no difference whether the container searched is owned by the driver or the passenger. *Wyoming v. Houghton*, 526 U.S. 295, 301 (1999). Officers may inspect *any* container potentially concealing contraband in a vehicle when probable cause exists to believe the vehicle contains contraband. *Id.*

However, Plaintiff also alleges "Officer Woods and Mia . . . walked up and confirmed that the bottle did not contain methamphetamine" or a bag—just prescription pill residue. [Doc. 27, p. 6]. One thing of note, here. Plaintiff kind of plays fast and loose with her allegation. With the way she's framed it, there is no way to know who, be it Officer Woods or Mia, told Officer Chambers the bottle didn't contain methamphetamine. *See* [*id.*]. Notwithstanding her vague allegation as to who actually told Officer Chambers the good news about the pill bottle, "[a] policeman's mistaken belief of fact can properly contribute to a probable cause determination and can count just as much as a correct belief as long as the mistaken belief was reasonable in the light of all the circumstances." *United States v. Gonzalez*, 969 F.2d 999, 1006 (11th Cir. 1992). So, if it turns out Officer Chambers searched Plaintiff's belongings between the supposed methamphetamine discovery and him learning that it was, in fact, not methamphetamine, then her unlawful search claim is out. *See* [Doc. 27, p. 6]. Put simply, if Officer Chambers searched Plaintiff's bags in this narrow window of time, then

25

"probable cause undoubtedly existed for the [search]." *See Gonzalez*, 969 F.2d at 1005. If, though, as Plaintiff alleges, Officer Chambers and Officer Woods "returned to [Mia's] vehicle and began searching Plaintiff's belongings" after *Officer Woods*—not Mia— confirmed what he found was "only residue from Mia's . . . prescription pills," then it may be that their after-the-fact search of Plaintiff's bags was not objectively reasonable given her clear refusal to consent to a search of her personal belongings. *See id.*; [Doc. 27, pp. 5–6]. If this turns out to be the true version of events, then "this case is considerably closer and raises doubts" about whether a search—post-communiqué about prescription pill residue—was constitutional. *See Gonzalez*, 969 F.2d at 1005.

Until such time as the facts of this case can be further fleshed out, Plaintiff's claims in Count Three—for what are really just claims for unlawful search against Officer Chambers and Officer Woods—may proceed. Consequently, any determination on the qualified-immunity front will have to be made later as well. For now, though, Officer Chambers and Officer Woods' 12(b)(6)-based effort to dismiss Plaintiff's Fourth Amendment claims for unlawful search and seizure in Count Three stands **DENIED**.

### 3. <u>Count Four: Plaintiff's Fourteenth Amendment Claim Against Officer Chambers for Alleged Due Process Violations</u>

In Count Four, "Plaintiff alleges her Fourteenth Amendment [rights were] violated because she was never notified of the obstruction warrant, never informed of the status of the [conduct] investigation, and was unable to address or respond to the

charges before being arrested." [Doc. 27, pp. 6–7].

First, the Eleventh Circuit has explained there is no substantive or procedural due process right to an investigation of excessive force. *See Vinyard*, 311 F.3d at 1356 (arrestee "has no substantive right of any kind to an investigation of her excessive force complaint," and noting the lack of "any federal or state court decision, statute, regulation or other source of law that gives [arrestee] an entitlement to an internal investigation . . . of her complaints of police brutality."). Second, there is no right under the Due Process Clause of the Fourteenth Amendment to either respond to or receive notice of an arrest warrant. *See Guerrero v. Blakely*, No. 6:12–CV–1072–CLS–SGC, 2014 WL 4686482, at *4 (N.D. Ala. Sept. 12, 2014) (discussing the absence of "legal authority that creates a constitutional right to receive" notice prior to the issuance of an arrest warrant and arrest). Thus, Plaintiff's claim concerning her lack of notice for the arrest warrant and lack of opportunity to respond to the obstruction charge before being arrested is meritless.

An arrest under warrant is not a violation of due process; *it is* the very essence of due process. *Dobbs v. Huff*, 446 F. Supp. 35, 39 (N.D. Ga. 1977). As the Supreme Court has explained:

> Exclusive reliance on the Fourth Amendment is appropriate in the arrest context . . . because the Amendment was tailored explicitly for the criminal justice system, and its balance between individual and public interests always has been thought *to define the process that is due* for seizures of person or property in criminal cases. Furthermore[,] the protections afforded

27

> during an arrest and initial detention are only the first stage of an elaborate system, unique in jurisprudence, designed to safeguard the rights of those accused of criminal conduct.

*United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 50–51 (1993) (emphasis added) (internal citations omitted). This undoubtedly forecloses Plaintiff's Fourteenth Amendment claim for procedural due process violations raised in Count Four such that the Court **GRANTS** Officer Chambers' dismissal efforts pursuant to Rule 12(b)(6). Count Four is **DISMISSED with prejudice**.[4] *Dixon v. Bd. of Cnty. Comm'rs Palm Beach Cnty., Fla.*, 518 F. App'x 607, 610 (11th Cir. 2013) ("A Rule 12(b)(6) dismissal with prejudice is an adjudication on the merits.") (citing *Lobo v. Celebrity Cruises, Inc.*, 704 F.3d 882, 893 (11th Cir. 2013)).

### 4.   <u>Count Five: Plaintiff's First Amendment Retaliation Claims Against Officer Chambers and Officer Woods</u>

In their effort to have the Court dismiss Plaintiff's First Amendment retaliation claims asserted against them, Officer Chambers and Officer Woods direct the Court to *Neives v. Bartlett*, 587 U.S. 391, 401–06 (2019). [Doc. 31-1, p. 10]. Relying on *Neives*, they argue the presence of probable cause generally defeats a First Amendment retaliation claim. Clearly, given the Court's above discussion, that's not going to be sufficient for the Court to dismiss Plaintiff's retaliation claims at this early stage. [*Id.*].

---

[4] As a general proposition, dismissal of a complaint for failure to state a claim operates as an adjudication on the merits. *See N.A.A.C.P. v. Hunt*, 891 F.2d 1555, 1560 (11th Cir.1990) ("[U]nless [a] court specifies otherwise, dismissal on the grounds that the facts and law show no right to relief operates as an adjudication on the merits[.]").

"'[A]s a general matter[,] the First Amendment prohibits government officials from subjecting an individual to retaliatory actions' for engaging in protected speech." *Neives*, 587 U.S. at 398 (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)). "If an official takes adverse action against someone based on that forbidden motive, and 'non-retaliatory grounds are in fact insufficient to provoke the adverse consequences,' the injured person may generally seek relief by bringing a First Amendment claim." *Id.* For a plaintiff to succeed on this type of retaliation claim, she must establish a causal connection between the state defendant's retaliatory animus and her subsequent injury. *Id.* (quoting *Hartman*, 547 U.S. at 259) (cleaned up).

In her Amended Complaint, Plaintiff alleges body-cam footage would show that "Officer Woods asked Officer Chambers if he was going to take Plaintiff to jail" and that Officer Chambers "responded no because to his knowledge . . . Plaintiff had spoken and complained to the Sheriff several times already." [Doc. 27, p. 8]. In *Neives*, the Supreme Court reiterated that it's "not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must cause the injury. 587 U.S. at 398. Specifically, it must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Id.* (citing *Hartman*, 547 U.S. at 260).

Taking Plaintiff's allegations as true, however, it's plausible Officer Chambers and Officer Woods' actions towards Plaintiff during the N&C Marine Incident,

29

stemmed from the complaints she made against them regarding the McDonald's Incident. [Doc. 27, pp. 5, 8]. After all, Officer Chambers certainly knew about Plaintiff's prior complaints made against him and Officer Woods. [*Id.* at p. 8]. However, as the Supreme Court discussed in *Nieves*, "the want of probable cause" for a retaliation claim in this context will generally make or break a plaintiff's entire case. *Nieves*, 587 U.S. at 405 (quoting *Brown v. Selfridge*, 224 U.S. 189, 191 (1912)). So, put simply, Plaintiff's retaliation claims against Officer Chambers and Officer Woods boil down to whether there was some form of probable cause for the obstruction warrant.

After a detailed discussion on not only the interplay between a citizen's First Amendment rights and an officer's discharge of his lawful duties, the Supreme Court ruled where "there was probable cause" to, as relevant to this case, "[detain]" an individual, a retaliation claim "fails as a matter of law." *Neives*, 587 U.S. at 408. Here, the Court is not yet able to make any determination as it relates to probable cause. Again, the body-cam footage capturing what occurred in the N&C Marine Incident would have been most helpful. For some reason, though, no party has yet to place it on the record.

Without a determination as to probable cause, the Court must **DENY** Officer Chambers and Officer Woods' 12(b)(6)-based motion as it relates to Plaintiff's First Amendment retaliation claims in Count Five. This, of course, leaves only Plaintiff's state law claims asserted against Officer Chambers and Officer Woods for the Court's consideration.

30

**STATE LAW CLAIMS**

1.    **Count Eight: Plaintiff's False Imprisonment Claim Against Officer Chambers**

Officer Chambers and Officer Woods first argue that each of Plaintiff's state law claims asserted against them in their personal capacity are barred by the doctrine of official immunity. [Doc. 31-1, pp. 11–13]. They argue they're entitled to official immunity for Plaintiff's alleged violations of state law because her Amended Complaint challenges their discretionary conduct and fails to adequately allege supporting facts giving rise to an inference that they performed their discretionary duties with actual malice or an intent to harm her. [*Id.* at p. 11 (first quoting Ga. Const. art. I, § II, para. IX(d); and then citing *Cameron v. Lang*, 549 S.E.2d 341, 344–45 (Ga. 2001))].

"Georgia's doctrine of official immunity—much like qualified immunity under federal law—'offers public officers and employees limited protection from suit in their personal capacity.'" *Bohanan v. Paulding Cnty., Ga.*, 479 F. Supp. 3d 1345, 1364 (N.D. Ga. 2020) (quoting *Gilbert v. Richardson*, 452 S.E.2d 476, 481 (Ga. 1994)). This immunity flows directly from the Georgia Constitution, which provides that state officers and employees

> may be subject to suit and may be liable for injuries and damages caused by the negligent performance of, or negligent failure to perform, their ministerial functions and may be liable for injuries and damages if they act with actual malice or with actual intent to cause injury in the performance of their official functions.

31

Ga. Const. art. I, § II, para. IX(d); *see also Gilbert*, 452 S.E.2d at 481, 483. Thus, the key focus for Plaintiff's state law claims is whether Officer Chambers or Officer Woods acted with "actual malice or intent to cause injury" while they performed their "official functions." *Gilbert*, 452 S.E.2d at 483. Georgia courts interpret the term "official functions" to mean "any act performed within the officer's . . . scope of authority, including both ministerial and discretionary acts." *Id.* "Whether an official's act is ministerial or discretionary is determined based on the facts of each case." *Speight v. Griggs*, 579 F. App'x 757, 759 (11th Cir. 2014) (citing *Grammens v. Dollar*, 697 S.E.2d 775, 777 (Ga. 2010)). "A ministerial act is commonly one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty." *Grammens*, 697 S.E.2d at 777 (citation omitted). A discretionary act, on the other hand, "calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed." *Id.*

In their motion, Officer Chambers and Officer Woods contend that "[t]he acts Plaintiff complains of here—investigating a call, directing occupants during an investigation, deciding whether to arrest, deciding how to handcuff or restrain, and conducting search activity during an ongoing law-enforcement encounter—are classic discretionary law-enforcement judgments." [Doc. 31-1, p. 12]. Yes, they are "classic discretionary . . . judgments," but such an over-generalized synopsis relegates several, if

32

not the majority, of Plaintiff's allegations to the wayside. Officer Chambers and Officer Woods say, "at most" Officer Chambers "removed [Plaintiff] from the vehicle." [*Id.*]. To say that Officer Chambers merely "removed" Plaintiff is about the biggest downplay one could give her allegations, and it certainly violates binding precedent by making an inference against a plaintiff when considering a motion under Rule 12(b)(6). *Andre*, 148 F.4th at 1291; *United States v. Henco Holding Corp.*, 985 F.3d 1290, 1296 (11th Cir. 2021). Moreso, Officer Chambers and Officer Woods would have this Court accept—on a motion to dismiss, mind you—that Plaintiff was "handcuffed [only] after she refused commands," despite her allegations clearly stating she "was not resisting" and "went to retrieve" her identification when Officer Chambers requested it. *See* [Doc. 31-1, p. 12], *in connection with* [Doc. 27, pp. 4, 10].

Nevertheless, Georgia law unquestionably requires a plaintiff to "allege the actual malice necessary to overcome official immunity for discretionary acts." *Murphy v. Bajjani*, 647 S.E.2d 54, 60 (Ga. 2007). So, with the clear existence of discretionary conduct, Officer Chambers and Officer Woods' assertion of official immunity for Plaintiff's state law claims comes down to whether she "[pled] facts showing actual malice or actual intent to injure." [Doc. 31-1, p. 12 (citing *Cameron*, 549 S.E.2d at 344)]. As for Plaintiff's claim for false imprisonment against Officer Chambers, Georgia law defines such a claim as "the unlawful detention of the person of another, for any length of time, whereby such person is deprived of his personal liberty." *Malone v. Johnson*, 667 F.

33

Supp. 3d 1257, 1273–74 (N.D. Ga. 2023) (citing O.C.G.A. § 51-7-20). The only elements required to plead a false imprisonment claim are an allegation of detention and an allegation that the detention was unlawful. *Id.* (citing *Collier v. Evans*, 406 S.E.2d 90, 92 (Ga. Ct. App. 1991)). Plaintiff has pled those requirements. For purposes of Rule 12(b)(6), her Amended Complaint plausibly alleges she was "unreasonably detained" "without lawful justification" by Officer Chambers. *Id.* at 1274; [Doc. 27, p. 9].

However, given the presence of discretionary conduct, Plaintiff needed to *allege* facts that would demonstrate that Officer Chambers acted with actual malice in order to overcome his assertion official immunity under Georgia law. *Murphy*, 647 S.E.2d at 60 (holding that a plaintiff must "allege the actual malice necessary to overcome official immunity for discretionary acts"); *see also Malone*, 667 F. Supp. 3d at 1274 (first citing *Kidd v. Coates*, 518 S.E.2d 124, 125 (Ga. 1999); and then citing *Daniels v. Gordon*, 503 S.E.2d 72, 75 (Ga. Ct. App. 1998)). Despite obviously having notice of Officer Chambers and Officer Woods' assertion of official immunity, Plaintiff made no effort or request to further amend her Amended Complaint—a practice she certainly knows how to do—to include any factual heft concerning actual malice. She only filed a response brief. Even there she not only failed to address Officer Chambers and Officer Woods' arguments on official immunity, but she wholly omitted any mention of her state law claims at all. *See generally* [Doc. 32]. Thus, the Court deems Plaintiff's state law claims **ABANDONED**. "[W]hen a party fails to respond to an argument or otherwise address a claim; the Court

deems such argument or claim abandoned." *Jones v. Bank of Am., N.A.*, 564 F. App'x 432, 434 (11th Cir. 2014).

Notwithstanding Plaintiff's clear abandonment of her state law claims, the Georgia Supreme Court has explained that "actual malice," as the term is used in the constitutional provision, denotes "express malice"—"a deliberate intention to do wrong." *Malone*, 667 F. Supp. 3d at 1274 (quoting *Murphy*, 647 S.E.2d at 60). It does not include "implied malice"—the reckless disregard for the rights or safety of others. *Id.* Georgia's courts say that a "deliberate intention to do wrong"—such as to constitute the actual malice necessary to overcome official immunity—must be the intent to cause the harm suffered by a plaintiff. *Id.* Actual malice requires "more than harboring bad feelings or ill will about another; rather, ill will must also be combined with the intent to do something wrongful or illegal." *Id.* (quoting *Wyno v. Lowndes Cnty.*, 824 S.E.2d 297, 304 (Ga. 2019)) (cleaned up). Similarly, an "actual intent to cause injury" means the "actual intent to cause harm to [an individual], not merely an intent to do the act purportedly resulting in the claimed injury. This definition of intent contains aspects of malice, perhaps a wicked or evil motive." *Id.* (quoting *Kidd*, 518 S.E.2d at 124).

Since Plaintiff did not allege or seek leave of court to allege facts that would demonstrate the actual malice necessary to overcome Officer Chambers' official immunity for discretionary acts, he is entitled to that immunity for her false imprisonment claim. *See Phillips v. Hanse*, 637 S.E.2d 11, 13 (Ga. 2006) (reaffirming that

35

"actual malice" must be a "deliberate intention to do wrong"). "At best," Plaintiff's

Amended Complaint "alleges facts suggesting [Officer Chambers] acted with implied

malice"—reckless disregard for her rights—but that's not enough to overcome official

immunity under Georgia law. *Malone*, 667 F. Supp. 3d at 1274–75. Accordingly, the

Court **GRANTS** Officer Chambers' 12(b)(6)-based motion to dismiss as to Plaintiff's

false imprisonment claim. Count Eight is **DISMISSED with prejudice**. *Murphy*, 647

S.E.2d at 60; *Dixon*, 518 F. App'x at 610; n.4, *supra*.

### 2.   <u>Count Nine: Plaintiff's IIED Claim Against Officer Chambers and Officer Woods</u>

Next, with respect to Plaintiff's IIED claim against Officer Chambers and Officer

Woods, her allegations, notwithstanding her abandonment of this claim, are

insufficient. *See Jones*, 564 F. App'x at 434. Under Georgia law, a claim of IIED has four

elements. First, there must be an allegation that a defendant's conduct was intentional

or reckless. *Giles v. Manser*, 757 F. App'x 891, 893 (11th Cir. 2018) (citing *Metro. Atlanta

Rapid Transit Auth. v. Mosley*, 634 S.E.2d 466, 470 (Ga. Ct. App. 2006)). Second, the

alleged conduct has to have been extreme and outrageous. *Id.* Third, there must be a

causal connection between the wrongful conduct and the plaintiff's emotional distress.

*Id.* Fourth and finally, the plaintiff's emotional distress must be severe. *Id.*

As to her IIED claim, Plaintiff alleges that Officer Chambers and Officer Woods'

"conduct caused her severe emotional distress." [Doc. 27, p. 9]. This is far too

conclusory to withstand a motion to dismiss. While the Court is assuredly aware of the "full picture" painted by Plaintiff's Amended Complaint, she bears the responsibility to properly present her claims in compliance with Rule 8—that is, to delineate which allegations pertain to which claim. *Menzie v. Ann Taylor Retail Inc.*, 549 F. App'x 891, 896 (11th Cir. 2013) (quoting Fed. R. Civ. P. 8). A plaintiff must specifically articulate which facts and law go with which counts. *See Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1323 (11th Cir. 2015) (discussing that it is impermissible to assert a claim "without specifying which of the defendants are responsible for which acts"). These requirements remain in place even though Plaintiff is proceeding pro se. A plaintiff's pro se status does not excuse mistakes regarding procedural rules. *McNeil v. United States*, 508 U.S. 106, 113 (1993). Further, "it goes without saying that [a] court is barred from amending a plaintiff's [operative pleading]" sua sponte because doing so "may create the impression that it has become the plaintiff's advocate." *Miccosukee Tribe of Indians of Fla. v. United States*, 716 F.3d 535, 559 (11th Cir. 2013).

Here, Plaintiff failed to comply with Rule 8 in her Amended Complaint when it came to her IIED claim. She needed to assert "more than labels and conclusions." *Giles*, 757 F. App'x at 893 (citing *Twombly*, 550 U.S. at 570, 545). "Unsurprisingly, Georgia courts dismiss IIED claims when plaintiffs fail to allege facts supporting the elements of IIED." *Id.* (citing *Thompson-El v. Bank of Am., N.A.*, 759 S.E.2d 49, 53 (Ga. Ct. App. 2014) (affirming dismissal of IIED claim because the complaint "failed to allege any acts by

37

the defendants that were extreme and outrageous or that [plaintiff's] emotional distress was so severe that no reasonable person could be expected to endure it.")). "Thus, to survive a motion to dismiss under Georgia IIED law, [Plaintiff] was required to plead more than the conclusory allegation that [she] suffered IIED." *Id.* Plaintiff's allegations related to her IIED claim are threadbare and lack enough detail to properly allege IIED under Georgia law. *Id.*

In addition to her pleading deficiencies as far as Rule 8 is concerned, Plaintiff also failed to allege or seek leave to allege facts demonstrating the requirement of actual malice sufficient to overcome Officer Chambers and Officer Woods' assertion of official immunity under Georgia law for her IIED claim. *See Murphy*, 647 S.E.2d at 60. With respect to IIED, Plaintiff's allegations, even liberally construed in the light most favorable to her, amount to nothing more than a possible reckless disregard for her right to be free from emotional distress. *Andre*, 148 F.4th at 1291; *Murphy*, 647 S.E.2d at 60.

Thus, Plaintiff's IIED claim merely presents implied malice, and as discussed above, Georgia courts hold that implied malice does not reach the level of actual malice needed to overcome an assertion of official immunity. *Murphy*, 647 S.E.2d at 60. For these reasons, the Court must **GRANT** Officer Chambers and Officer Woods' 12(b)(6)-based motion to dismiss as to Plaintiff's IIED claim asserted against them. Count Nine is **DISMISSED with prejudice**. *Dixon*, 518 F. App'x at 610; n.4, *supra*.

38

**3.    Count Eleven: Plaintiff's Negligence Claim Against Officer Chambers**

Plaintiff also asserts a negligence claim against Officer Chambers based on her allegation that he "failed to intervene, prevent, or take corrective action against [Defendant] Elder's conduct." [Doc. 27, p. 9]. As with the previously discussed state law claims, Plaintiff failed to discuss her negligence claim as well. *See generally* [Doc. 32]. Accordingly, the Court deems it abandoned. *See Jones*, 564 F. App'x at 434. Notwithstanding abandonment, Plaintiff's negligence can also be dismissed based on Officer Chambers' assertion of official immunity. *See* [Doc. 31-1, p. 11].

There is nothing from Plaintiff's allegations in her Amended Complaint that would permit the Court to so much as infer actual malice when it comes to Officer Chambers' alleged failure to intervene. *Murphy*, 647 S.E.2d at 60. There is simply no allegation that Officer Chambers' inaction was underscored by some "wicked or evil motive" driven by a hope or want for Defendant Elder to harm Plaintiff. *See id*; *Wyno*, 824 S.E.2d at 304. Therefore, without any allegation that could reasonably cause the Court to infer actual malice, Plaintiff's negligence claim only sounds in a potential reckless disregard for her safety, and that is insufficient to overcome Officer Chambers' assertion of official immunity. *Murphy*, 647 S.E.2d at 60; *Malone*, 667 F. Supp. 3d at 1274.

As the Court stated earlier, it's fully aware of the "picture" painted by Plaintiff's allegations, and while it must construe the reasonable inferences from those allegations the light most favorable to her, it's not—when it comes to actual malice—required to

39

assume the absolute worst and stretch her allegations to the extent of stating a plausible claim. *See Andre*, 148 F.4th at 1291; *GJR Invs., Inc.*, 132 F.3d at 1369 (holding that a litigant's pro se status "does not give a court license to serve as de facto counsel for a party . . . or to rewrite an otherwise deficient pleading in order to sustain an action"). To assume the worst of Officer Chambers' alleged failure to intervene and twist Plaintiff's allegations, where, in fact, none exist on the topic, so that the requirement of actual malice is injected into her allegations "may create the impression that [the Court] has become [Plaintiff's] advocate." *Miccosukee Tribe of Indians of Fla.*, 716 F.3d at 559. This, the Court cannot do.

Thus, the fact that Plaintiff failed to allege or seek leave of court to allege the actual malice necessary to overcome Officer Chambers' official immunity for discretionary acts requires the Court to **GRANT** his 12(b)(6)-based effort to dismiss the negligence claim asserted against him. Given the absence of actual malice alleged in the Amended Complaint, Plaintiff's negligence claim in Count Eleven is **DISMISSED with prejudice**. *Jones*, 564 F. App'x at 434; *see* n.4, *supra*.

### 4.    Count Twelve: Plaintiff's Malicious Prosecution Claim

As for Plaintiff's claim for malicious prosecution, Georgia law, like federal law, requires a plaintiff to prove there was no probable cause for the underlying seizure in a malicious prosecution claim. *See Thompson v. Clark*, 596 U.S. 36, 43 (2022); O.C.G.A. § 51-7-40 ("A criminal prosecution which is carried on maliciously and without any probable

cause and which causes damage to the person prosecuted shall give [her] a cause of action."); *Wal-Mart Stores, Inc. v. Blackford*, 449 S.E.2d 293, 294 (1994). Under Georgia law, there are six elements to sustain a claim for malicious prosecution. O.C.G.A. § 51-7-40. First, there must be a prosecution for a criminal offense. *Blackford*, 449 S.E.2d at 294 (citing *Commercial Plastics, etc., Corp. v. Molen*, 355 S.E.2d 86, 87 (Ga. Ct. App. 1987)). Second and third, the prosecution must be instigated without probable cause and with malice. *Id.* Fourth and fifth, the prosecution must stem from a valid warrant, accusation or summons that terminated favorably to the plaintiff. *Id.* And sixth, the prosecution must have caused damage to the plaintiff. *Id.*

The Georgia Supreme Court has said that "[t]he gravamen of [a malicious prosecution claim] is the absence of probable cause on the part of the person instituting the prosecution." *K-Mart Corp. v. Coker*, 410 S.E.2d 425, 426 (Ga. 1991); *see generally Monroe v. Sigler*, 353 S.E.2d 23 (Ga. 1987). "The determination is dependent upon whether the facts as they appeared at the time of instituting the prosecution were such as to lead a person of ordinary caution to entertain a belief that the accused was guilty of the offense charged." *Blackford*, 499 S.E.2d at 294. If probable cause for the criminal prosecution is shown, then the civil action fails. *Id.* (citing *Akins v. Warren*, 375 S.E.2d 605, 605 (Ga. 1989)).

So, by and large, the same considerations for probable cause discussed above would apply to Plaintiff's claim for malicious prosecution, but there are two reasons

this claim fails. *Schilling v. Doherty*, No. 25-10321, 2026 WL 412038, at *2 (11th Cir. Feb. 13, 2026). First, since Plaintiff failed to specifically address her state law claim for malicious prosecution in her response brief, she abandoned it. *Jones*, 564 F. App'x at 434 (quoting *Kramer v. Gwinnett Cnty., Ga.*, 306 F. Supp. 2d 1219, 1221 (N.D. Ga. 2004) ("[A] party's failure to respond to any portion or claim in a motion indicates such portion, claim or defense is unopposed."); *see generally* [Doc. 32].

Abandonment aside, Plaintiff also failed to comply with Rule 8 for her malicious prosecution claim. In her Amended Complaint, Plaintiff does not state against whom she asserts this claim. While Plaintiff, as a pro se litigant, is afforded pleading leniency, she still must follow procedural rules. That, of course, again, is her obligation to comply with Rule 8. It's Plaintiff's responsibility to link or "associate" at least one defendant with each of her claims. *Douglas v. Yates*, 535 F.3d 1316, 1322 (11th Cir. 2008) (affirming dismissal of defendants that plaintiff failed to "associate" with an alleged constitutional violation) (citing *Pamel Corp. v. P.R. Highway Auth.*, 621 F.2d 33, 36 (1st Cir. 1980)) ("While we do not require technical niceties in pleading, we must demand that the complaint state with some minimal particularity how overt acts of the defendant caused a legal wrong.")). When it comes to her malicious prosecution claim, there is no way to know against whom Plaintiff asserts this claim.

In Georgia,

[t]he law draws a fine line of demarcation between cases where a party

42

> directly or indirectly urges a law enforcement official to begin criminal proceedings and cases where a party merely relays facts to an official who then makes an independent decision to arrest or prosecute. In the former case there is potential liability for . . . malicious prosecution; in the latter case there is not.

*Everett v. Cobb Cnty., Ga.*, No. 1:17-CV-3392-TWT, 2018 WL 2219435, at *2 (N.D. Ga. May 15, 2018) (quoting *Willis v. Brassell*, 469 S.E.2d 733, 737 (Ga. Ct. App. 1996)). Georgia's courts are clear "that initiation of the criminal action need not be expressly directed by the party to be held liable," and "[a] person may be liable [for malicious prosecution] where 'he gave information to the investigating officer which he knew to be false and so unduly influenced the authorities.'" *Willis*, 469 S.E.2d at 737 (citation omitted).

Considering Rule 8, it would be impermissible for the Court to infer, just because Plaintiff names Officer Chambers and Officer Woods in her Amended Complaint, that they are automatically the ones who made the independent decision to prosecute her for obstruction. *Id.*; *Miccosukee Tribe of Indians of Fla.*, 716 F.3d at 559. Even in Plaintiff's allegations, she says Officer Chambers decided *not* to take her to jail on October 10, 2023, and it wasn't until "approximately a year and a half later," Plaintiff alleges she became aware of the obstruction warrant. [Doc. 27, pp. 8–9]. Applying Georgia law as to who all may be liable in a claim for a malicious prosecution, it's completely unclear, based on Plaintiff's allegations, *who* decided "to begin criminal proceedings" against her. *See* [*id.* at p. 9]. While Plaintiff alleges she "had been charged" with obstruction, her use of passive voice conveniently omits *who* charged her. [*Id.*]. It could've been Franklin

43

County's sheriff, his chief deputy, or his investigator. Just as easily, it could've been Franklin County's district attorney, or, perhaps, it could've been Officer Chambers or Officer Woods. Based on Plaintiff's allegations, however, there is just no way to know who this claim is against, and courts routinely hold complaints "defective" when they fail "to connect [a] defendant with the alleged wrong." *Douglas*, 535 F.3d at 1322 (quoting 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1234, at 381–85 (3d ed. 2004)).

Since Plaintiff failed to name at least one specific defendant with respect to her malicious prosecution claim, it easily follows that she did not allege facts concerning the requisite actual malice through "a deliberate intention to do wrong." *Murphy*, 647 S.E.2d at 60. Accordingly, to the extent Plaintiff's malicious prosecution claim is against either Officer Chambers or Officer Woods, the Court **GRANTS** each of their 12(b)(6)-based efforts to dismiss this claim through official immunity. Count Twelve is **DISMISSED with prejudice**. *Dixon*, 518 F. App'x at 610 (11th Cir. 2013); n.4, *supra*. Further, given Plaintiff's failure to "associate" at least one defendant with her malicious prosecution claim, she has not "show[n]" she is "entitled to relief" for it. *Douglas*, 535 F.3d at 1322; *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)). Therefore, the Court also **DISMISSES** it for failure to state a claim pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).

## ORDER TO SHOW CAUSE

Now, notwithstanding these rulings, the Court has serious abstention concerns.

44

The Court is, of course, referring to *Younger v. Harris*. What is going on with the obstruction charge from October 10, 2023? Is the charge a misdemeanor or felony? Has the charge been dismissed? Has it been placed on a dead docket? Has the applicable statute of limitations now run such that Franklin County can no longer bring the obstruction charge?

*Younger*'s abstention doctrine "derives from 'the vital consideration of comity between the state and national governments,'" and it prevents this Court from interfering with the potentially ongoing criminal prosecution against Plaintiff out of Franklin County. 401 U.S. 37 (1971); *31 Foster Children v. Bush*, 329 F.3d 1255, 1279 (11th Cir. 2003). In *Younger*, the Supreme Court held that federal courts should abstain from suits aimed at restraining pending state criminal prosecutions. 401 U.S. at 41. Federal courts "should assume that state procedures will afford an adequate remedy" to address allegations of the kind asserted by Plaintiff in this case. *See 31 Foster Children*, 329 F.3d at 1279. The Court must consider "the likelihood" that this case will "seriously disrupt[] the legitimate functioning of the judicial system of the state." *Wells v. Mulholland*, No. 24-12535, 2025 WL 1860248, at *1 (11th Cir. July 7, 2025).

There are exceptions to *Younger* abstention, which the Court expects the parties to address in response to this **ORDER** to **SHOW CAUSE**. Specifically, these exceptions look to whether "(1) there is evidence of state proceedings motivated by bad faith; (2) irreparable injury would occur; or (3) there is no adequate alternative state forum where

45

the constitutional issues can be raised." *Wells*, 2025 WL 1860248, at *2 (quoting *Johnson v. Florida*, 32 F.4th 1092, 1099 (11th Cir. 2022)). To decide whether any of these three exceptions are applicable, the Court wants to see the arrest warrant itself and the sworn affidavit that led to it. Finally, in addition to these documents, the parties, either jointly or separately, should provide answers to the questions previously listed as well as the current status of the obstruction charge from October 10, 2023. [Doc. 27, p. 7].

The deadline to respond to this Order to Show Cause is ***March 18, 2026***.

### CONCLUSION

As set out above, the Court **GRANTS** Officer Chambers and Officer Woods' motion to dismiss as follows. The Court:

- **DISMISSES** Plaintiff's due process claim asserted against Officer Chambers in Count Four pursuant to the Fourteenth Amendment **with prejudice**;

- **DISMISSES** Plaintiff's state law claim for false imprisonment asserted against Officer Chambers in Count Eight **with prejudice**;

- **DISMISSES** Plaintiff's state law claim for IIED asserted against Officer Chambers and Officer Woods in Count Nine **with prejudice**;

- **DISMISSES** Plaintiff's state law claim of negligence against Officer Chambers in Count Eleven **with prejudice**; and

- **DISMISSES** Plaintiff's state law claim for malicious prosecution against Officer Chambers and Officer Woods **with prejudice**.

With respect to the following claims, however, the Court **DENIES** Officer Chambers and Officer Woods' motion to dismiss as follows:

- Plaintiff's Fourth Amendment claim for unlawful seizure and excessive force against Officer Chambers in Count One shall proceed for further factual development;

- Plaintiff's Fourth Amendment claims for unlawful search and seizure against Officer Chambers and Officer Woods in Count Three shall proceed for further factual development; and

- Plaintiff's First Amendment retaliation claims asserted against Officer Chambers and Officer Woods in Count Five shall proceed for further factual development.

Based on the Court's rulings, Officer Chambers and Officer Woods, along with Plaintiff and Defendant Elder, must further develop this record so the Court can determine whether probable cause or arguable probable cause exists in this case. Taking Plaintiff's allegations from her Amended Complaint as true, the Court is not able to make that determination.

Lastly, the Court **DIRECTS** the Clerk of Court to forward a copy of this Order and a copy of Plaintiff's Amended Complaint, filed on December 16, 2025, to Defendant Elder. Upon service of this Order and Plaintiff's Amended Complaint pursuant to Federal Rule of Civil Procedure 5(b)(2)(C), the Court **ORDERS** Defendant Elder to respond to the Amended Complaint within *21 days*. Fed. R. Civ. P. 15(a)(3); *see also* Fed. R. Civ. P. 8(b)–(c) and 12(b)–(c).

**SO ORDERED**, this 25th day of February, 2026.

S/ Tilman E. Self, III
**TILMAN E. SELF, III**
**UNITED STATE DITRICT JUDGE**

47