IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

| | |
|---|---|
| **MIRANDA WHITWORTH,**<br><br> *Plaintiff,*<br><br>**v.**<br><br>**Officer JOHNATHON CHAMBERS,** *in his individual capacity;* **Officer DANNY WOODS** *in his individual capacity;* **and JESSE ELDER,** *in his individual capacity*,<br><br> *Defendants.* | **CIVIL ACTION NO.**<br>**3:25-cv-00138-TES** |

## ORDER OF DISMISSAL

*As an old football coach once said to an underperforming offensive lineman now turned federal judge, "Video don't lie." Those wise words fit this case to a tee.*

Via a (rather lengthy) written Order [Doc. 35] dated February 25, 2026 (hereinafter the "February Order"), the Court granted in part and denied in part Officer Johnathon Tyler Chambers' and Officer Danny Bryan Woods' motion to dismiss made pursuant to Federal Rule of Civil Procedure 12(b)(6). *See* [Doc. 31], *in connection with* [Doc. 35]. Defendant Jesse Elder was not a movant to that motion. [Doc. 35, p. 5 n.1].

### *YOUNGER v. HARRIS*

Towards the end of the February Order, the Court noted its serious abstention concerns as they might relate to an obstruction charge against Plaintiff Miranda

Whitworth out of Franklin County, Georgia, from October 10, 2023. [*Id.* at pp. 44–45].

Plaintiff, Officer Chambers, and Officer Woods have responded to the Court's

abstention concerns, as ordered. [Doc. 40]; [Doc. 45]. While the Court mentions a few

facts here and there as may be necessary for *this* Order, the specifics of what Plaintiff

alleges in this case are discussed in greater detail in the February Order. [Doc. 35, pp. 2–

11]; [Doc. 45, p. 2]. In addition to various tort claims under Georgia law, Plaintiff alleges

several constitutional violations from an encounter with Officer Chambers, Officer

Woods, and Defendant Elder. [Doc. 27, pp. 4–9].

The events Plaintiff relies on to support her claims for this lawsuit occurred on

October 10, 2023. [*Id.* at p. 3]. Officer Chambers completed an incident report on

October 11, 2023, and obtained a warrant for the offense of misdemeanor obstruction

under O.C.G.A. § 16-10-24 on October 14, 2023. *See, e.g.*, [Doc. 40-1, p. 1]; [Doc. 45-1, p. 1

(listing charges as "16-10-24 - OBSTRUCTING OR HINDERING LAW ENFORCEMENT

OFFICERS")]; [Doc. 45-1, p. 2 (listing entry date of "10/11/2023")]; *see also* [Doc. 27, pp.

6–7, 10]. For quite some time, the obstruction change remained pending at the warrant

stage, but according to Officer Chambers' and Officer Woods' counsel, "the information

presently available . . . reflects that the charge did not proceed to trial or adjudication on

the merits and was ultimately dismissed on or about January 12, 2026." [Doc. 40, p. 1];

[Doc. 45, p. 2]. In looking at the information presented to the Court by Plaintiff, Officer

Chambers, and Officer Woods, there is no indication that the obstruction charge from

2

October 10, 2023, "remains the subject of an ongoing state criminal proceeding." [Doc. 40, p. 1]; *see also* [Doc. 45, pp 1–3]. Therefore, the parties have shown the Court that abstention under *Younger v. Harris*, 401 U.S. 37 (1971), is not warranted in this case.

Proceeding on, the Court notes that when it ruled on Officer Chambers' and Officer Woods' motion to dismiss in the February Order, it was unable to make either an actual or arguable probable-cause determination (ergo any qualified-immunity determination) on Plaintiff's constitutional claims asserted via 42 U.S.C. § 1983. Throughout its February Order, the Court noted that "the footage from the body-cam Plaintiff so clearly alleges she was ultimately able to obtain" would've been helpful in determining the presence or absence of either probable cause or arguable probable cause regarding Officer Chambers' and Officer Woods' reliance on qualified immunity. [Doc. 35, pp. 22, 30]; *see also* [Doc. 27, p. 7]. With only Plaintiff's Amended Complaint [Doc. 27] at hand, when considering and taking her allegations as true and in construing reasonable inferences from those allegations in her favor, it appeared that either cause classification may have been lacking—hence the grant-in-part and deny-in-part ruling. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 572 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Andre v. Clayton Cnty., Ga.*, 148 F.4th 1282, 1291 (11th Cir. 2025); *Green v. Surine*, No. 25-10817, 2026 WL 381376, at *3 (11th Cir. Feb. 11, 2026) (citing *Skop v. City of Atlanta*, 485 F.3d 1130, 1137 (11th Cir. 2007)). In short, the Court couldn't definitively decide the qualified-immunity defense raised by Officer Chamber and Officer Woods.

The body-cam footage has since been placed on the record. However, before turning to the requested relief before the Court, a brief introductory primer might prove helpful.

**<u>BACKGROUND</u>**

This case offers somewhat of a rare procedural anomaly. At the outset of her lawsuit, Plaintiff requested, and the Court granted, leave to proceed *in forma pauperis* ("IFP") pursuant to 28 U.S.C. § 1915. *See* [Doc. 2], *in connection with* [Doc. 3, p. 2]. After conducting the statutorily required frivolity review under § 1915(e), the Court ordered the United States Marshals Service to serve Plaintiff's original Complaint [Doc. 1] on Officer Chambers, Officer Woods, and Defendant Elder. *See generally* [Doc. 3]; Fed. R. Civ. P. 4(c)(3). During the time it took for a deputy marshal to serve Plaintiff's original Complaint, she undertook various efforts to amend until finally landing on the operative Amended Complaint filed on December 16, 2025. [Doc. 8]; [Doc. 9]; [Doc. 14]; [Doc. 15]; [Doc. 27]. Having been served, Officer Chambers and Officer Woods moved to dismiss the Amended Complaint, but the Court, as discussed above, granted their efforts in part and denied them in part. *See generally* [Doc. 31]; [Doc. 35]. In the mix of Plaintiff's efforts to amend, Defendant Elder filed an Answer [Doc. 8] but only as to her original Complaint. So, when the Court ruled on Officer Chambers' and Officer Woods' motion to dismiss, it instructed the Clerk of Court to mail Defendant Elder a copy of its February Order and a copy of Plaintiff's Amended Complaint for service under Rule 5(b)(2)(C). [Doc. 45, p. 47].

In response to those mailings, Defendant Elder filed his Answer [Doc. 37] to Plaintiff's Amended Complaint and his own Motion to Dismiss [Doc. 39] on March 4, 2026. Defendant Elder is proceeding pro se, so like Plaintiff, his pleading is going to be held to a less stringent standard and will be liberally construed. *Hughes v. Lott*, 350 F.3d 1157, 1160 (11th Cir. 2003); Fed. R. Civ. P. 7(a) (listing "an answer to a complaint" as a pleading). Like his co-defendants, Defendant Elder moved to dismiss the claims Plaintiff asserts against him in her Amended Complaint pursuant to Rule 12(b)(6). [Doc. 39, pp. 1, 3–5]. Defendant Elder also seeks dismissal pursuant to Rule 12(b)(1) for lack of subject-matter jurisdiction. [*Id.* at pp. 1–3].

With routine arguments under Rule 12(b) at the helm, you might be asking yourself how this case presents a procedural anomaly because by all intents and purposes, it seems relatively standard—as far as motions practice goes. Remember though, Plaintiff is, at her own request, proceeding IFP—so that means the Court must dismiss her case if, "at any time," it determines that "the action . . . fails to state a claim on which relief may be granted." 28 U.S.C. § 1915(e)(2)(B)(ii) (statutory language that "the [C]ourt *shall* dismiss . . . .") (emphasis added). That's the procedural anomaly. Although there's only one motion before the Court, Defendant Elder's, the Court nevertheless dismisses Plaintiff's entire case based upon the clear presence of at least arguable probable cause underlying her remaining claims. The remaining claims are as follows.

As for Plaintiff's remaining federal claims, in Count One she asserts claims for unlawful seizure and excessive force against Officer Chambers and Defendant Elder under the Fourth Amendment. [Doc. 27 p. 3]. In the February Order, however, the Court parsed Plaintiff's claims asserted in Count One into two sperate counts: one against Officer Chambers and the other against Defendant Elder. [Doc. 35, p. 12]. So, Count One asserts Fourth Amendment-based claims for unlawful seizure and excessive force against Officer Chambers, and Count Two asserts them against Defendant Elder. [Doc. 27, p. 3]; [Doc. 35, p. 12]. Next, in Count Three, Plaintiff asserts unlawful-search claims against Officer Chambers and Officer Woods.[1] [Doc. 27, pp. 5–6]. In Count Five, Plaintiff asserts retaliation claims under the First Amendment against Officer Chambers and Officer Woods. [*Id.* at p. 8].

Then, under Georgia law, all that remains are three claims against Defendant Elder: one for battery in Count Six, one for assault in Count Seven, and one for intentional infliction of emotional distress ("IIED") in Count Ten.[2] [*Id.* at pp. 8–9]. For the reasons discussed below, the Court **GRANTS** Defendant Elder's motion to dismiss,

---

[1] Plaintiff asserted a claim under the Fourteenth Amendment for an alleged violation of due process in Count Four of her Amended Complaint, but the Court dismissed that claim with prejudice in the February Order. [Doc. 27, pp. 6–7]; [Doc. 35, pp. 13, 26–28].

[2] Plaintiff's state law claims for false imprisonment, IIED, negligence, and malicious prosecution against Officer Chambers, and her claims for IIED and malicious prosecution against Officer Woods were all dismissed with prejudice on various grounds, namely on official immunity under Georgia law, in the February Order. [Doc. 35, pp. 31–44, 46].

*and* even though Officer Chambers and Officer Woods have not filed another dispositive motion (either under Rule 12(c) or Rule 56), the Court **DISMISSES** Plaintiff's remaining claims against them **with prejudice** pursuant to § 1915(e)(2)(B)(ii) for failure to state a claim. Simply put, this case is finished.

## LEGAL STANDARD

As with the detailed specifics of what Plaintiff alleges in this case, the relevant legal standards that guide efforts to dismiss for failure to state a claim are more fully presented in the February Order. [Doc. 35, pp. 2–5]. Whether dismissal is made pursuant to Rule 12(b)(6) or § 1915(e)(2)(B)(ii), the same standards apply. *Mitchell v. Farcass*, 112 F.3d 1483, 1490 (11th Cir. 1997) ("The language of [§] 1915(e)(2)(B)(ii) tracks the language of . . . Rule . . . 12(b)(6).").

Then, as for dismissals under Rule 12(b)(1) for lack of subject-matter jurisdiction, district courts should grant such dismissal efforts only if "it appears to a certainty, that [a] plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief." *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 702–03 (11th Cir. 1985). Attacks on subject-matter jurisdiction may be "facial" or "factual." *Lawrence v. Dunbar*, 919 F.2d 1525, 1528–29 (11th Cir. 1990). A facial attack is based solely on the allegations in a complaint, which are taken as true for the purposes of the motion to dismiss. *Id.* A factual attack challenges the existence of subject-matter jurisdiction in fact, and a court is "free to weigh the evidence and satisfy itself as to the existence of its power to hear

the case." *Id.*

## DISCUSSION

Along with his motion, Defendant Elder filed the body-cam footage from October 10, 2023. *See* [Doc. 38]. On that date, Plaintiff alleges that she and her cousin, Mia Turner, pulled into a boat dealership in Franklin County, "due to Mia's vehicle overheating." [Doc. 27, p. 3]. Plaintiff doesn't really allege why the police were called to scene, but when viewing the body-cam footage, Mia told Officer Chambers that "the secretary" of the boat dealership was "here by herself, so I guess I scared her, and so she called you guys."

Officer Chambers then asks Mia for her driver's license, and he instructs her to step to the rear of her vehicle. [*Id.* at p. 4]. Plaintiff alleged that Officer Chambers put in his incident report that he asked Mia to step to the rear of her vehicle "with the intent of gaining consent to search [it]." [*Id.*]. Easily enough, that pans out from the incident report, but there's more to it. *See, e.g.,* [Doc. 45-1, p. 2]. The Court notes that Officer Chambers wrote about gaining consent to search the vehicle because Mia was "shaking badly" and had trouble holding onto her license. [*Id.*]. Whatever "shaking" Officer Chambers may have seen, though, it's not visible within the body-cam frame when Mia hands her license over to him. That, of course, isn't at all relevant to how *Plaintiff* conducted herself during the encounter.

Even though "shaking" may not be visible on the body-cam footage when Mia

pulled her license out of her wallet to hand it to Officer Chambers, the body-cam footage—as it relates to Plaintiff—paints quite a different picture than what she alleged in her Amended Complaint. This is where Plaintiff's case crumbles. In her Response [Doc. 41] to Defendant Elder's motion to dismiss, Plaintiff argues over and over again that what her Amended Complaint "alleges" must be taken as true at the motion-to-dismiss stage. [Doc. 41, pp. 1–3]. Plaintiff is not incorrect, but the Eleventh Circuit's incorporation-by-reference doctrine throws rather a large kink in her efforts to keep her claims alive through the well-known tenet that allegations in a complaint "must be accepted as true." [*Id.* at p. 3 (Plaintiff's argument that "[t]hese allegations must be accepted as true at this stage.")].

## A.    Incorporation-By-Reference Doctrine

Generally, when considering a motion to dismiss, district courts must limit their consideration to the operative complaint and any exhibits attached to it. *Baker v. City of Madison, Ala.*, 67 F.4th 1268, 1276 (11th Cir. 2023) (citing *Grossman v. Nationsbank, N.A.*, 225 F.3d 1228, 1231 (11th Cir. 2000)). If the parties present, and district courts consider evidence outside of a complaint, a motion to dismiss generally must be converted into one for summary judgment. *Id.* (citing Fed. R. Civ. P. 12(d) and *Finn v. Gunter*, 722 F.2d 711, 713 (11th Cir. 1984)). There are, however, two exceptions to this general rule.

The first is the Eleventh Circuit's incorporation-by-reference doctrine, and the second, not applicable here, is judicial notice. *Id.* (citing *Tellabs, Inc. v. Makor Issues &*

9

*Rts., Ltd.*, 551 U.S. 308, 322 (2007) ("[C]ourts must consider [a] complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."). Under the incorporation-by-reference doctrine, district courts may consider evidence attached to a motion to dismiss without converting the motion into one for summary judgment if "the plaintiff refers to certain documents in the complaint," those documents are "central to the plaintiff's claim," and the documents' contents are undisputed. *Id.* (quoting *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002)). "Evidence is 'undisputed' in this context if its authenticity is unchallenged." *Id.* (citing *Horsley*, 304 F.3d at 1134).

Here, the incorporation-by-reference doctrine easily applies to the body-cam footage Defendant Elder submitted concurrently with his motion to dismiss. *Id.* at 1277 (citing *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005) (explaining that "a document need not be physically attached")). First, Plaintiff referenced the body-cam footage several times in her Amended Complaint. *See, e.g.*, [Doc. 27, pp. 7–8]. "At one point," Plaintiff "even alleged," what the body-cam footage would show and that she herself was able to obtain it. [*Id.*]. In fact, minus a few very big omissions, it's how she presented the play-by-play of her allegations. *See* [*id.* at pp. 3–9].

Second, the body-cam footage depicts the events that are central to Plaintiff's claims. *Baker*, 67 F.4th at 1277. The body-cam footage shows all the relevant conduct and

10

is particularly clear here because the incident took place during daylight hours, "so the area depicted in the footage is well-lit." *Id.* "[T]he footage presents both visual and audio depictions of the events that transpired, and . . . for the most part, the viewer has a good angle of the events with no visual obstructions." *Id.*

Third, the body camera footage is undisputed because Plaintiff does not challenge its authenticity. *Id.* (citing *Horsley*, 304 F.3d at 1134). Plaintiff never puts forth a single argument or any allegations that the body-cam footage has been altered in any way. *See id.* Nor does she offer any "contention that what the footage depicts differs from what actually happened." *Id.* Again, the requirements of the incorporation-by-reference doctrine are easily met with respect to the body-cam footage Defendant Elder placed on the record, so the Court considered it in ruling on his motion to dismiss and in dismissing Plaintiff's remaining § 1983 claims against Officer Chambers and Officer Woods pursuant to § 1915(e)(2)(B)(ii).

As the Court already noted, the body-cam footage placed on the record isn't without its visual limitations. Although there are very few instances of this, there are things mentioned in the written filings in this case that are not captured within the frame of the body-cam by award-winning cinematography. So, in heeding the Eleventh Circuit's requirements when that occurs, the Court "construe[d] all ambiguities in the video footage" in Plaintiff's favor and construed "all ambiguities in the written [filings] in [her] favor" as well. *Id.* (citing *Speaker v. U.S. Dep't of Health & Hum. Servs.*, 623 F.3d

11

1371, 1379 (11th Cir. 2010)).

Where, though, as in this case, the video clearly shows the relevant acts and "obviously contradicts . . . [P]laintiff's alleged facts," the Court "accept[s] the video's depiction instead of the . . . account" she put forth in her Amended Complaint and "view[s] the facts in the light depicted by the video." *Id.* at 1277–78 (first citing *Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1315 (11th Cir. 2010); and then citing *Scott v. Harris*, 550 U.S. 372, 381 (2007)). "After all, courts are not required to rely on 'visible fiction.'" *Scott*, 550 U.S. at 380–81.

### B.      Body-Cam Footage

Candidly, for the most part, Plaintiff's account from her Amended Complaint lines up quite well with what the body-cam footage depicts. However, it's clear now, that Plaintiff was, let's say, "rather artful" in pleading her allegations when it came to *her* actions in response to Officer Chambers' requests. As discussed by the Court in the February Order, Plaintiff alleges that when Officer Chambers made his way to her side of the vehicle, he asked for her identification. [Doc. 27, p. 4]; [Doc. 35, p. 6]. As she "went to retrieve it," Plaintiff alleges that "Officer Chambers opened the door and told her to exit the vehicle." [Doc. 27, p. 4]; [Doc. 35, p. 6]. Stating that she "had not committed a crime," Plaintiff says she asked Officer Chambers why she needed to get out. [Doc. 27, p. 4]; [Doc. 35, p. 6]. It was then, according to her Amended Complaint, Officer Chambers told her if she didn't, he'd "pull her from the vehicle and charge her

12

with obstruction." [Doc. 27, p. 4]; [Doc. 35, p. 6].

In construing these allegations in the light most favorable to Plaintiff, the Court reasoned that it was "highly plausible that after Officer Chambers asked Plaintiff for her identification, she 'went to retrieve it,' and simultaneously questioned why she needed to exit the vehicle since, so she claims, 'she had not committed a crime.'" *Andre*, 148 F.4th at 1291; [Doc. 35, pp. 19–20 (quoting [Doc. 27, p. 5])]. So, "[t]hrough the lens of accepting a plaintiff's well-pled factual allegations as true and construing them accordingly," it was not completely outside "the realm of possibilities that Officer Chambers 'pulled [Plaintiff] from the vehicle' *while* she was in the process of complying with his request." [Doc. 35, p. 20 (first citing *Twombly*, 550 U.S. at 555, 572; and then citing *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1273 n.1 (11th Cir. 1999)) (emphasis added). Throughout this lawsuit, Plaintiff has staked the plausibility of her claims on the argument that she "was not given time to produce" her identification. [Doc. 32, p. 2]; *see also Iqbal*, 556 U.S. at 678 (holding that a claim is plausible when "the pleaded factual content allows [a] court to draw a reasonable inference that the defendant is liable for the misconduct alleged"). Nothing, and the Court means "nothing" could be further from the truth.

In no uncertain terms, Plaintiff alleges that "[b]efore [she] could even retrieve her [identification], Officer Chambers pulled her from the vehicle with her [identification] still in her hand." [Doc. 27, p. 4]. What? Notwithstanding the fact that this self-

13

contradictory allegation could not have literally or logically happened, the body-cam footage unquestionably shows it isn't true. Despite her contrived efforts to portray herself as the picturesque model of compliance in her Amended Complaint, here's what really happened. Where it matters, she has *blatantly* misrepresented the facts.

After speaking with Mia, Officer Chambers walked to Plaintiff's side of the vehicle where her window was already down. Once there, she says to her, "Ms. Miranda, do you have an I.D.?" After briefly looking at Officer Chambers, she looks back down at the cellphone in her hand and says, "Uhhhh." After a brief, brief moment of thinking, she leans forward, grabs her wallet from her purse, and Officer Chambers lightly pats the top of the vehicle and says, "Do you mind just hopping out of the car for me?" "No, I'm not doing that with you today," she replied, "I've got to go to work. Ehhh, no, I'm not doing that." "Huh?" Officer Chambers asked. Then, he said, "Okay, ma'am, I'm asking you to step out of the car," and in some overlapping conversation, Plaintiff says, "I've not done nothing wrong. She just pulled over to put antifreeze in her car." "Okay. Listen, listen ma'am," Officer Chambers said just before Plaintiff started to record this encounter for "[her] attorney," "Listen, listen. So, I'm gonna explain this to you, okay?" Plaintiff then can be seen swiping through a cellphone, trying to get to an app so she can record what's happening. Officer Chambers says,

> Okay, I'm gonna explain this to you. I'm giving you a lawful order to step out because I was called out here. I'm asking you to step out of the car. Okay, so you can either remove yourself from the car, or I can remove you

14

from the car. And then, you can get an obstruction charge, okay?" Throughout Officer Chambers' commands Plaintiff mumbles "no" and "naw" as she continuously scrolled on the cellphone.

In one final moment of Job-like patience, Officer Chambers says, "Okay, so I don't know what, uh, you can either step out of the car, or I'm gonna remove you from the car." Then, in obvious frustration in trying to find the camera app on her cousin's cellphone, Plaintiff yells to her, "Mia, where's your damn camera?" "Alright, ma'am," Officer Chambers says, as he reaches for the vehicle's door handle, which prompted Plaintiff to look at Officer Chambers and say, "No." She then yells, "Mia, where's your fuckin' camera!" "Ma'am," Officer Chambers said, "I have a body camera right here."

Still swiping on that cellphone, Plaintiff says, "I'm . . . I'm the passenger. I don't have to get out. I've not committed a crime." "You do," Officer Chambers replied. Plaintiff then stated arguing with Officer Chambers, and ended up informing him, "my lawyer's on this shit." Oh, and by the way, she still hasn't gotten out of the vehicle. So, once more, Officer Chambers, with simple a gesture for her to exit the vehicle says, "I need you to step out of the car." This, however, brought on a brief exchange about how Officer Chambers knew that Plaintiff's name was Miranda (well, it was because Mia told him earlier when he was speaking to her), and she says, "You know who I am," implying that he was out to get her. "No, I do not," Officer Chambers responded, "step out of the car, ma'am." "You're being recorded," she told him. "That's fine," he said,

15

"everything is recorded. Step out of the car." "You tell me *why*," Plaintiff demanded. "Because I'm telling you to step out of the car," he told her. "What did I do," she asked? "I don't know. I am . . . I am conducting an investigation," Officer Chambers said just before reaching for Plaintiff's arm to pull her from the vehicle.

Contrary to Plaintiff's allegation that she "was removed from the vehicle very quickly," the body-cam footage clearly shows Officer Chambers merely grabbing her arm and doing what he had to do to get her out of it. [Doc. 27, p. 9]. Plaintiff also alleges in her Amended Complaint that she "was not resisting," yet, clear as day she can be seen on the video reaching up and holding onto the vehicle's doorframe trying to pull herself back into the seat. [*Id.* at p. 10]. More than that, she's screaming, "Stop it! . . . Stop it!" It was then Defendant Elder inserted himself into the situation to help Officer Chambers pin Plaintiff against the vehicle.

As Plaintiff yelled in hysterics to Defendant Elder, "You broke my arm! You broke my arm," he held her right arm behind her back as Officer Chambers worked to put her wrists in handcuffs. While Mia can be seen filming from another point of view, Defendant Elder told Plaintiff, "Right there. Stay right there. Hush. Hush. Hush!"[3] Plaintiff continued to scream, telling her cousin, "Call my mama! . . . Call 911!" "You do what you're told, and you ain't gotta worry about that stuff. . . . You wasn't doing what

---

[3] Even through Plaintiff's cousin can be seen recording the encounter from another point of view on either her cellphone or Plaintiff's, Plaintiff never filed that version on the record.

you were told," Defendant Elder said to her. "I wasn't doing anything. I don't have to get out of the car," Plaintiff insisted, "it's my right! I done pissed all over myself, now!" Making double sure that her cousin is recording everything that's happening, Plaintiff says, "Record him, Mia! Call my daddy!"

With her hands cuffed, Officer Chambers walks Plaintiff to the front of the vehicle where he tells her, "Have a seat, right there." Bewildered at what had just transpired, Officer Chambers asked, "What was? What was the? What was the problem with this?" In response, Plaintiff says, "Because we did this at McDonald's, man." Again, should you need to know what Plaintiff means by that, the Court refers you to the February Order, and if you need even more, to another one of Plaintiff's lawsuits against these same two officers. *See* [Doc. 35, pp. 7–8]; *see also* Complaint, *Whitworth v. Franklin Cnty. Det. Ctr.*, 3:25-cv-00106-TES (M.D. Ga. June 27, 2025), Dkt. No. 1.

"I just wanted you to step out of the car," Officer Chambers says. "But *why*?" she pleaded. Fed up, Officer Chambers tells her, "Because I am conducting an investigation! I was called out here." "What you investigating?" Plaintiff asked. "I don't know. That is the whole problem. That is why I am out here," Officer Chambers told her just before he walked back to his patrol car to get a pair of disposable gloves so he can pick up the driver's license that had fallen next to Plaintiff's urine. With that, let's get to her remaining claims.

17

### C. Plaintiff's Remaining Claims

In the February Order, the Court discussed what's required for each of Plaintiff's remaining claims. For the sake of clarity, though, it inserts those requirements in this Order as well but in an abridged version.

### 1. Count One: Plaintiff's Fourth Amendment Claims Against Officer Chambers for Unlawful Seizure and Excessive Force

First up is Count One. There, Plaintiff asserts Fourth Amendment-based claims for unlawful seizure and excessive force against Officer Chambers in his individual capacity. [Doc. 27, pp. 2–5]. As the Court noted in the February order, "[s]omething many fail to understand is that '[n]ot all deprivations of a right . . . are redressable.'" [Doc. 35, p. 15 (quoting *Andre*, 148 F.4th at 1291)]. The doctrine of qualified immunity "offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* (quoting *Grider v. City of Auburn*, 618 F.3d 1240, 1254 (11th Cir. 2010)). Thus, whether Officer Chambers is entitled to qualified immunity for Plaintiff's claims of unlawful seizure and excessive force "turns on whether [he] violated clearly established Fourth Amendment law." *Green*, 2026 WL 381376, at *3 (affirming protection of qualified immunity at summary judgment). The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated,

and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

For a person to be seized, her "'freedom of movement' must be restrained 'by means of physical force or a show of authority.'" *Andre*, 148 F.4th at 1292 (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). "An arrest—the quintessential seizure of a person—occurs when the government applies physical force to seize a person or asserts lawful authority to which the subject accedes." *California v. Hodari D.*, 499 U.S. 621, 624, 626–27 (1991). Here, Plaintiff was clearly "seized" and "arrested, "however briefly," but that seizure was beyond any doubt, lawful. *United States v. Wright*, 862 F.3d 1265, 1282 (11th Cir. 2017). The secretary from the boat dealership called Officer Chambers to the business, and Officer Chambers, as he told Plaintiff over and over, was there to investigate. Despite Plaintiff's lay opinion of the law—that "I'm the passenger. I don't have to get out. I've not committed a crime," and her jab to Officer Chambers that "Well, you don't know the law" she's very wrong. Quite wrong, indeed.

The 1977 Supreme Court case of *Pennsylvania v. Mimms* tells us that police officers, as a matter of course, may order the driver of a lawfully stopped car to exit her vehicle. 434 U.S. 106, 110–11 (1977). While Officer Chambers didn't "stop" Mia's vehicle for a traffic violation—she pulled into the boat dealership because her car was overheating—he was lawfully on the scene because he was responding to a call from its

19

secretary and was investigating. *See United States v. Jordan*, 635 F.3d 1181, 1186 (11th Cir. 2011) (holding that "the Fourth Amendment does not prohibit a police officer, 'in appropriate circumstances and in an appropriate manner from approaching a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest'") (quoting *Terry v. Ohio*, 392 U.S. 1, 22 (1968)) (alterations adopted); [Doc. 27, p. 3].

Years later, in *Maryland v. Wilson*, the Supreme Court expanded the *Mimms* rule and held that a police officer may order *passengers* to get out of the car pending completion of his stop or investigation without violating the Fourth Amendment. 519 U.S. 408, 414–15 (1997). Regardless of whether it's an actual lawful traffic stop, "[i]t is also reasonable for passengers to expect that a police officer at the scene of a crime, arrest, or *investigation* will not let people move around in ways that could jeopardize his safety." *Brendlin v. California*, 551 U.S. 249, 258 (2007) (emphasis added). The true factual account—the one from the body-cam footage—clearly shows that Officer Chambers was constitutionally permitted to ask Plaintiff to remove herself from the passenger seat of Mia's vehicle while he conducted his investigation. *Wilson*, 519 U.S. at 415; *Brendlin*, 551 U.S. at 258. Thus, Officer Chambers is entitled to qualified immunity, and Plaintiff's unlawful seizure claim against him is **DISMISSED with prejudice** under § 1915(e)(2)(B)(ii) for failure to state a claim.

The Fourth Amendment's protection against unreasonable seizures also

"encompasses the right to be free from excessive force during the course of a criminal apprehension." U.S. Const. amend. IV; *Corbitt v. Vickers*, 929 F.3d 1304, 1315 (11th Cir. 2019) (quoting *Oliver v. Fiorino*, 586 F.3d 898, 905 (11th Cir. 2009)). To establish a Fourth Amendment claim for excessive force, a plaintiff must first allege that a seizure occurred and that the force used to effectuate the seizure was unreasonable. *Corbitt*, 929 F.3d at 1315 (quoting *Troupe v. Sarasota Cnty.*, 419 F.3d 1160, 1166 (11th Cir. 2005)). The test, like the one for whether a seizure is unlawful, is also an objective one. *Andre*, 148 F.4th at 1292 (quoting *Hodari*, 499 U.S. at 628); *Oliver*, 586 F.3d at 905. To determine whether the use of force is "objectively reasonable," courts "balance 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against 'the countervailing governmental interests at stake' under the facts of the particular case." *Oliver*, 586 F.3d at 905 (quoting *Graham v. Connor*, 490 U.S. 386, 388, 394–96 (1989)). Courts "measure the quantum of force employed against these factors—the severity of the crime at issue; whether the suspect poses an immediate threat to the safety of the officers or others; and whether the suspect actively resisted arrest or attempted to evade arrest by flight." *Id.* (quoting *Lee v. Ferraro,* 284 F.3d 1188, 1197–98 (11th Cir. 2002)).

The linchpin for these types of Fourth Amendment claims rests on whether actual probable cause or even arguable probable cause supported an officer's actions. *Green*, 2026 WL 381376, at *3 (citing *Skop*, 485 F.3d at 1137); *see also Brown v. City of Huntsville*, 608 F.3d 724, 734 (11th Cir. 2010). Seizures are unreasonable unless

21

supported by either cause classification. *See Green*, 2026 381376, at *3. "[W]hether an officer possesses either actual or arguable probable cause depends on the elements of the alleged crime and the operative fact pattern." *Id.* (quoting *Edger*, 84 F.4th at 1237).

The alleged crime in question in this case is, of course, obstruction. [Doc. 27, pp. 4, 7, 9–10]; [Doc. 45-1, p. 1]. "A knowing and willful refusal to provide identification to an officer acting in the lawful discharge of his official duties may constitute obstruction" under O.C.G.A. § 16-10-24(a). *Green*, 2026 WL 381376, at *3 (quoting *Brown v. GeorgiaCarry.org, Inc.*, 770 S.E.2d 56, 60 (Ga. Ct. App. 2015)). "[A] person who knowingly and willfully obstructs or hinders any law enforcement officer . . . in the lawful discharge of his or her official duties shall be guilty of a misdemeanor." O.C.G.A. § 16-10-24(a). In *Green*, the Eleventh Circuit ruled that officers had probable cause to make an arrest when an individual "refused to provide identification upon request." 2026 WL 381376, at *4.

That's exactly what happened here. For nearly a minute-and-a-half, Officer Chambers made request . . . after request . . . after request for Plaintiff to get out of the vehicle. Plaintiff drafted her allegations to cause the Court to believe that Officer Chambers gave her virtually no time to comply with his demand. She alleged that "[b]efore Plaintiff[] could even retrieve her [identification], Officer Chambers pulled her from the vehicle." That's just demonstrably not true. *See Baker*, 67 F.4th at 1277.

"[T]he Fourth Amendment addresses 'misuse of power[.]'" *Brower v. Cnty. of*

*Inyo*, 489 U.S. 593, 596 (1989) (quoting *Byars v. United States*, 273 U.S. 28, 33 (1927)).

Then, expounding on that, the Eleventh Circuit has explained "that unprovoked force against a non-hostile and non-violent suspect who has not disobeyed instructions" is unreasonable and, when accompanied by injury to the suspect, may "violate[ ] that suspect's rights under the Fourth Amendment." *Fils v. City of Aventura*, 647 F.3d 1272, 1289 (11th Cir. 2011). While Plaintiff wasn't necessarily violent, the body-cam footage clearly shows that she was hostile to Officer Chambers, disobeyed, and repeatedly sidelined his instructions to get out of the car. When it comes to Plaintiff's allegations from her Amended Complaint—that she did not disobey Officer Chambers' order to provide her identification and "was not resisting"—the body-cam footage shows something vastly different. [Doc. 27, pp. 5, 10]. Notwithstanding her continued defiance of Officer Chambers' commands, Plaintiff can clearly be seen reaching up and holding onto the vehicle's doorframe trying to pull herself back into the seat—in short, resisting. Accordingly, Officer Chambers is entitled to qualified immunity for Plaintiff's excessive force claim as well, and the Court **DISMISSES** it **with prejudice** under § 1915(e)(2)(B)(ii) for failure to state a claim.

### 2. Count Two: Plaintiff's Fourth Amendment Claims Against Defendant Elder for Unlawful Seizure and Excessive Force

Unlike Plaintiff's § 1983 claims against Officer Chambers and Officer Woods, who are undeniably state actors, the Court must address whether Defendant Elder,

whom Plaintiff also sues in his individual capacity, can be considered a state actor for purposes of liability under § 1983. [Doc. 27, p. 2]. In his motion, Defendant Elder argues that he "is a private citizen and was not acting under color of law nor . . . as a government official," and therefore, cannot be held liable under § 1983 for Plaintiff's unlawful seizure and excessive force claims asserted against him. [Doc. 39, p. 2].

Remember, as the Court noted in the February Order, stating a claim for relief under § 1983 requires a plaintiff to allege that an act or omission deprived her of a right, privilege, or immunity secured by the Constitution or a statute of the United States and that the act or omission was committed by a person acting under color of state law. [Doc. 35, pp. 11–12 (citing *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579, 1582 (11th Cir. 1995))]. So, to employ § 1983 as a remedy for a deprivation of constitutional rights, a litigant must show that the alleged deprivation was committed by someone acting under the color of state law—by a state actor. *Hale*, 50 F.3d at 1582.

To succeed on a § 1983 civil rights claim against a private party, the private party must qualify as a state actor—"§ 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful." *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1277 (11th Cir. 2003) (quoting *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999)). A private citizen "may be viewed as a state actor under § 1983 '[o]nly in rare circumstances.'" *Brown v. Lewis*, 361 F. App'x 51, 54 (11th Cir. 2010) (quoting *Harvey v. Harvey*, 949 F.2d 1127, 1130 (11th Cir. 1992)). The Eleventh

24

Circuit uses three tests to determine whether a private citizen acts under color of state law for § 1983 purposes. *Focus on the Family*, 344 F.3d at 1277. First, there's the public function test, which asks whether the private actor was performing functions "traditionally the exclusive prerogative of the [S]tate." *Id.* Second, there's the state compulsion test, which applies to situations where the government coerced or significantly encouraged the unconstitutional actions at issue. *Brown*, 361 F. App'x at 54 (citing *Focus on the Family*, 344 F.3d at 1277). And third, there's the nexus/joint action test, which applies where the State and the private party were joint participants in the common enterprise. *Id.*

In Count Two, Plaintiff's unlawful seizure and excessive force claims against Defendant Elder, as a bystander, allege that Defendant Elder "had no authority to restrain her" and used excessive force against her in violation of the Fourth Amendment.[4] [Doc. 27, p. 5]. The Supreme Court has held that the Fourth Amendment applies only to governmental actions. *See Burdeau v. McDowell*, 256 U.S. 465, 475 (1921). The making of arrests are "traditionally the exclusive prerogative of the [S]tate," but there is nothing in the body-cam footage to indicate that Officer Chambers "coerced or significantly encouraged" Defendant Elder's participation in helping him put handcuffs

---

[4] In her Amended Complaint, Plaintiff also alleges that Defendant Elder "previously *worked* in law enforcement." [Doc. 27, p. 10 (emphasis added)].

25

around Plaintiff's wrists.[5] *Focus on the Family*, 344 F.3d at 1277; *Brown*, 361 F. App'x at 54. So, that leaves only the nexus/joint action test. *Brown*, 361 F. App'x at 54 (citing *Focus on the Family*, 344 F.3d at 1277).

Under the nexus/joint action test, the Supreme Court has held that a "willful participant in joint activity with the State or its agents" is a state actor. *See United States v. Price*, 383 U.S. 787, 794 (1966). This type of "joint activity," however, requires the State to have an "ongoing relationship" that insinuates the State "so far . . . into a position of interdependence with the [private entity] that it was a joint participant in the enterprise." *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 357–58 (1974). Think of a private medical provider that handles medical needs in a state prison.

So, "[w]hen a private citizen steps in to render brief, *ad hoc* assistance to a police officer," and there's nothing to indicate proof of a conspiracy to violate someone's constitutional rights, there is no "ongoing relationship" between the State and the private entity. *Charles v. Johnson*, 18 F.4th 686, 697 (11th Cir. 2021). In short, "a civilian's rendering of brief, *ad hoc* assistance to a law enforcement officer is not state action," and since "§ 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful," the Court **GRANTS** Defendant Elder's motion to dismiss

---

[5] Moreover, Plaintiff even alleges in her Amended Complaint that at a state court judge denied her battery charge against Defendant Elder based on testimony from Officer Chambers that "he needed [Defendant Elder's] help to restrain [her]." [Doc. 27, p. 7].

26

under Rule 12(b)(1) for lack of subject-matter jurisdiction. *Id.*; *Focus on the Family*, 344 F.3d at 1277.

State action is a jurisdictional prerequisite to a § 1983 claim, and since Defendant Elder was not acting "under color of state law" for his *ad hoc* assistance to Officer Chambers, Plaintiff's allegations for her § 1983 claim against Defendant Elder fail to support a basis for jurisdiction under 28 U.S.C. § 1331. *Charles*, 18 F.4th at 697; *Crespo v. Georgia*, No. 3:20-CV-38-CAR, 2021 WL 1686472, at *6 (M.D. Ga. Mar. 15, 2021), *aff'd*, No. 21-11323, 2022 WL 1398124 (11th Cir. May 3, 2022); *see also Navarro v. Rodrigues*, No. 5:13-CV-406-RS-GRJ, 2014 WL 51364, at *4 (N.D. Fla. Jan. 7, 2014), *aff'd,* 574 F. App'x 928 (11th Cir. 2014). Accordingly, the Court **DISMISSES** Plaintiff's unlawful seizure and excessive force claims against Defendant Elder **without prejudice**.[6] A dismissal for lack of subject-matter jurisdiction is entered without prejudice because it is not a judgment on the merits. *Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008). If a court lacks subject-matter jurisdiction over a particular claim, it also lacks the power to dismiss that claim with prejudice as an adjudication on the merits. *Id.* at 1234–35.

---

[6] Even if Defendant Elder was a state actor, he'd be entitled to qualified immunity for Plaintiff's unlawful seizure and excessive force claims since Officer Chambers' act of pulling her from the vehicle was constitutionally permissible. In short, these claims would also be subject to dismissal under Rule 12(b)(6).

3.    **Count Three: Plaintiff's Fourth Amendment Claims Against Officer Chambers and Officer Woods for Unlawful Search and Seizure**

Given the Court's above discussion regarding what constitutes a seizure under the Fourth Amendment, the Court, in considering Count Three, only focuses on law concerning unlawful searches. Again, the Fourth Amendment, in relevant part, provides: "The right of the people to be secure in their persons . . . and effects, against unreasonable searches . . . shall not be violated . . . but upon probable cause[.]" As the text of the Fourth Amendment indicates, "reasonableness" is the "ultimate touchstone," and whether there was probable cause is determined based on the totality of the circumstances. *Heien v. North Carolina*, 574 U.S. 54, 61 (2024) (quoting *Riley v. California*, 573 U.S. 373, 134 (2014)); *Illinois v. Gates*, 462 U.S. 213, 230 (1983). To be reasonable is not to be perfect, and so the Fourth Amendment allows or some mistakes on the part of government officials, giving them "fair leeway for enforcing the law in the community's protection." *Heien*, 574 U.S. at 60–61 (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)).

The Fourth Amendment generally requires an officer to have a warrant supported by probable cause to search an individual's personal property. *See United States v. Wilson*, 979 F.3d 889, 910 (11th Cir. 2020). But this requirement is subject to several well-established exceptions—including the "automobile exception." The Supreme Court has held that the Fourth Amendment permits the warrantless search of

28

a vehicle where it is "readily mobile" and "probable cause exists to believe [it] contains contraband." *Maryland v. Dyson*, 527 U.S. 465, 467 (1999); *Carroll v. United States*, 267 U.S. 132, 153–56 (1925) (upholding the warrantless search of vehicle that officers had probable cause to believe contained illegal liquor). "For purposes of the automobile exception, probable cause exists when 'there is a fair probability that contraband or evidence of a crime will be found in the vehicle under the totality of the circumstances.'" *Watkins v. Johnson*, 853 F. App'x 455, 462 (11th Cir. 2021) (quoting *United States v. Delva*, 922 F.3d 1228, 1243 (11th Cir. 2019)); *United States v. Tobin*, 923 F.2d 1506, 1510 (11th Cir. 1991) (en banc) (holding that an officer has probable cause to search when there is a "fair probability that contraband or evidence of a crime will be found in a particular place");

Further, a passenger in a private car, who has no possessory interest in the vehicle, does not have a legitimate expectation of privacy in the interior of the automobile, and, therefore, cannot contest the vehicle's search on Fourth Amendment grounds. *See Rakas v. Illinois*, 439 U.S. 128, 140, 143 n.12, 148 (1978); *United States v. Dixon*, 901 F.3d 1322, 1338 (11th Cir. 2018) (reaffirming that passengers generally do not have standing to contest a search of the interior of the vehicle "because [they do] not have the right to exclude others from the car") (quoting *United States v. Lee*, 586 F.3d 859, 864 (11th Cir. 2009)). That said, however, passengers do have standing to challenge the search of their belongings that are located inside the vehicle. *United States v. Barber*,

29

777 F.3d 1303, 1305 (11th Cir. 2015) (ruling that a passenger in a vehicle has a reasonable expectation of privacy in [her] belongings, such as a bag).

As discussed more fully in the Court's February Order, Plaintiff alleges that Mia gave consent to a search the vehicle [Doc. 27, p. 5]. From the body-cam footage, that allegation checks out. Mia unquestionably consented to Officer Chambers searching her vehicle, but that's the extent of it. Here's what the rest of the body-cam footage shows.

Placed in front of the passenger seat where Plaintiff was sitting are her bags. Officer Chambers then reaches over the console, grabs one of Mia's purses and begins the consensual search. A little over two minutes later, Mia hands Officer Chambers her cellphone and tells him that her mother wants to speak with him. He provides a brief summarization of what all is going on, telling her:

> Okay, so. They pulled up into a business that was closed. The clerk called and asked for one of us to come check it out. Okay? While I was talking to, uh . . . your, your daughter—I'm assuming that was the one that was driving—I asked her to step, she was already out of the car. I was trying to talk to her, 'cause it's—I mean it's odd, I was trying to conduct the investigation to see what they were doing, okay? I asked the passenger to step out of the car, and she refused. She refused multiple times. . . . I gave her multiple commands. So, we pulled her out of the car. I heard your daughter say that we threw her to the ground. She did not get thrown to the ground. She got pulled out of the car and placed in handcuffs, and she is just sitting in the back of my car. She doesn't even have charges on her right this second.

After a very polite exchange between Officer Chambers and Mia's mother, he resumed his search of the vehicle and began looking through a second bag that

belonged to Mia. A couple of minutes pass, and Officer Woods pulls into the boat dealership. To get him up to speed, Officer Chambers immediately tells Officer Woods, "So, I got consent from the driver to search the car." Officer Chambers then picks up his search of the vehicle from where he left off, and Officer Woods retrieves a pair of disposable gloves to assist. For a moment, Officer Chambers and Mia talk about how the vehicle was overheating, and he tells her, "If you pull into a business, that's fine, but not one that's about to close." Now, how was she supposed to know the boat dealership was closing? Let's be reasonable, here.

Officer Chambers is then seen walking up to Officer Woods, and he tells him, "So, I went through that bag, and the bottom two are Miranda's, but I don't have consent to search hers yet. So, I'm gonna talk to her and see if I can get consent. The rest of the vehicle, we have consent." That consent, he did not gain. When Officer Chambers returned to the vehicle, he told Officer Woods, "She said no to consent on her bags." Although Officer Woods didn't "search" Plaintiff's bags, he did move them to the hood of the car so they "could adequately search this motor vehicle." After moving them, Officer Woods picks up a prescription pill bottle and says, "And, right now, you have a bag with what appears to be methamphetamine residue, in this pill bottle." "Well, that changes everything," Officer Chambers said. Agreeing with him, Officer Woods, continued, "So, that kind of gives us probable cause to search the whole motor vehicle and everything in it. You might want to go tell her that."

31

This discovery would, of course, allow Officer Chambers and Officer Woods to engage in a constitutional, yet warrantless, search of "every part" of Mia's vehicle that might contain illegal substances. *See United States v. Ross*, 456 U.S. 798, 825 (1982) (holding that where probable cause justifies the search of a vehicle, "it justifies the search of every part of the vehicle and its contents that may conceal the object to the search"). When probable cause exists, it makes no difference whether the container searched is owned by the driver or the passenger. *Wyoming v. Houghton*, 526 U.S. 295, 301 (1999). Officers may inspect *any* container potentially concealing contraband in a vehicle when probable cause exists to believe the vehicle contains contraband. *Id.*

Following Officer Woods' suggestion, Officer Chambers makes his way back to his patrol car, opens the door, and tells Plaintiff, "Alright, so, I want to talk to the driver about this, too. We just found a pill bottle under a seat, with a baggie, that has methamphetamine residue in it, okay?" As Plaintiff shakes her head no, perhaps truthfully representing that she didn't know anything about it, Officer Chambers says, "So, that gives us probable cause in the State of Georgia to conduct a search . . . as to your bags." Even with this, Plaintiff reiterates, again, perhaps truthfully, that there was nothing he needed to know about in them. At this point, Officer Woods—pill bottle in hand—has made his way back to Officer Chambers' patrol car where he tells Officer Chambers, Plaintiff, and Mia, "Yeah, but it's got a clear crystal-like substance in it." Finding "Mia Turner" on the pill bottle, Officer Woods asks, "What's the clear crystal-

like substance that's in it?" Mia responds, "It's methadone. I'm sure of it. They're white. The wafers they give you now are like a white color." "Okay," says Officer Woods. Then, after handing the pill bottle back to Officer Chambers, Officer Woods tells Mia, "We'll check it out."

As Officer Woods begins a little Criminal Procedure 101 lesson with Plaintiff about complying with a police officer's lawful demands to exit a vehicle, *see Wilson*, U.S. at 414–15, Officer Chambers walks back to the vehicle. On his way back, Mia says, "That shouldn't have been in my floorboard, really. Oh, that's methadone. It's methadone. Yeah, you can taste it." Officer Chambers then turns *back* around and puts the pill bottle in the front seat of his patrol car, and then tells Mia, "Alright. Stay right—have a seat back on my bumper." Then, after Officer Woods' whole conversation with Mia about the residue in the pill bottle, Officer Chambers begins to search through Plaintiff's bags that were previously placed on the hood.

While Plaintiff claims in her Amended Complaint that whatever probable cause existed when Officer Chambers and Officer Woods thought they had found methamphetamine residue was "eliminated" when "it was determined on the scene that there was none." [Doc. 27, p. 6]. Well, according to the body-cam footage, that "determination" wasn't as concrete as Plaintiff makes it out to be. Officer Woods said, "We'll check it out," and after Mia told Officer Chambers it was "methadone" and that he could "taste it," he put the pill bottle in the front seat of his patrol car. So, we really

don't know *what* the substance was. Even if it turned out to be residue from prescribed medication, Officer Chambers' search of Plaintiff's bags, based on the totality of the circumstances, didn't violate the Fourth Amendment. It what could have been a mistake of fact about what was in the pill bottle meaning that Plaintiff's cousin "has not violated the law, but neither has [Officer Chambers] violated the Fourth Amendment. *Heien*, 574 U.S. at 57. "Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part." *Brinegar*, 338 U.S. at 176. Again though, circling back to the "ultimate touchstone" of the Fourth Amendment, "the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability." *Id.*; *Riley*, 573 U.S. at 134.

Throughout this entire encounter, Officer Chambers consistently voiced his suspicions of drug use. Whether his suspicious were right or wrong, "[a] policeman's mistaken belief of fact can properly contribute to a [probable-cause] determination and can count just as much as a correct belief as long as the mistaken belief was reasonable in the light of all the circumstances." *United States v. Gonzalez*, 969 F.2d 999, 1006 (11th Cir. 1992). Even though the "shaking" Officer Chambers says Mia exhibited can't been seen on the body-cam, he can clearly be heard telling Officer Woods, upon his arrival, that it "seems like she's under the influence of something . . . both of them do." So, considering the totality of the circumstance for this case, Officer Chambers had at least

34

arguable probable cause—if not actual probable cause—to believe that there was a "fair probability that contraband or evidence of a crime" would be found in the vehicle. *Tobin*, 923 F.2d at 1510; *Moore v. Gwinnett Cnty.*, 967 F.2d 1495, 1497–98 (11th Cir. 1992) (defining arguable probable cause as "asking whether a 'reasonable officer in the same circumstances and possessing the same knowledge as [a] [d]efendant could have believed that probable cause existed") (cleaned up). Accordingly, Officer Chambers and Officer Woods are entitled to qualified immunity on Plaintiff's unlawful search claims, and the Court **DISMISSES** them **with prejudice** under § 1915(e)(2)(B)(ii) for failure to state a claim.

### 4.    Count Five: Plaintiff's First Amendment Retaliation Claims Against Officer Chambers and Officer Woods

In Count Five, Plaintiff asserts a First Amendment-based claim for retaliation. In Officer Chambers' and Officer Woods motion to dismiss, they relied on *Neives v. Bartlett*, 587 U.S. 391, 401–06 (2019), to support their position that the presence of probable cause generally defeats a First Amendment retaliation claim. [Doc. 31-1, p. 10].

"'[A]s a general matter[,] the First Amendment prohibits government officials from subjecting an individual to retaliatory actions' for engaging in protected speech." *Neives*, 587 U.S. at 398 (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)). "If an official takes adverse action against someone based on that forbidden motive, and 'non-retaliatory grounds are in fact insufficient to provoke the adverse consequences,' the

injured person may generally seek relief by bringing a First Amendment claim." *Id.* For a plaintiff to succeed on this type of retaliation claim, she must establish a causal connection between the state defendant's retaliatory animus and her subsequent injury. *Id.* (quoting *Hartman*, 547 U.S. at 259) (cleaned up). However, as the Supreme Court discussed in *Nieves*, "the want of probable cause" for a retaliation claim in this context will generally make or break a plaintiff's entire case. *Nieves*, 587 U.S. at 405 (quoting *Brown v. Selfridge*, 224 U.S. 189, 191 (1912)).

While the Court was previously unable to make a probable-cause determination, it can now, and Plaintiff's retaliation claim is out. Consistent with the above discussions, probable cause undoubtedly underlies Plaintiff's unlawful seizure and excessive force claims, and at least arguable probable cause underlies her claims for unlawful search. Accordingly, Officer Chambers and Officer Woods are entitled to qualified immunity on Plaintiff's retaliation claims, and the Court **DISMISSES** them **with prejudice** under § 1915(e)(2)(B)(ii) for failure to state a claim.

### 5. Counts Six, Seven, and Ten: Plaintiff's State Law Claims Against Defendant Elder for Battery, Assault, and IIED

With these dismissals, all that remains are Plaintiff's claims against Defendant Elder for battery, assault, and IIED under Georgia law. [Doc. 27, p. 8–9]. However, given the rulings from the February Order and this Order, it's now up to the Court whether it wants to rule on Plaintiff's state law claims against Defendant Elder.

Having dispensed with all of Plaintiff's § 1983 claims, the claims that gave the Court federal-question jurisdiction under § 1331, and since Plaintiff and Defendant Elder are both Georgia citizens—meaning the Court does not have original subject-matter jurisdiction pursuant to 28 U.S.C. § 1332—the only way the Court may continue to adjudicate Plaintiff's state law claims against Defendant Elder is through its discretionary exercise of 28 U.S.C. § 1367's supplemental jurisdiction provision. [Doc. 27, p. 1]; [Doc. 37, pp. 2–3]. The Court **DECLINES** to exercise supplemental jurisdiction.

Federal courts may exercise supplemental jurisdiction over state law claims "in any civil action of which [they] have original jurisdiction." 28 U.S.C. § 1367(a). "[D]istrict courts may," however, "decline to exercise supplemental jurisdiction over a claim" if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "[S]tate courts, not federal courts, should be the final arbiters of state law," and when a federal court "has dismissed all federal claims from a case, there is a very strong argument for dismissal, especially where the federal claims are dismissed prior to trial." *Ingram v. Sch. Bd. of Mia.-Dade Cnty.*, 167 F. App'x 107, 108 (11th Cir. 2006) (quoting *Baggett v. First Nat'l Bank of Gainesville*, 117 F.3d 1342, 1353 (11th Cir. 1997)). "[D]istrict courts may not exercise jurisdiction absent a statutory basis." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005).

Recognizing this hard-and-fast rule, the Court declines to exercise supplementary jurisdiction over Plaintiff's remaining state law claims against

37

Defendant Elder in accordance with the discretion afforded to it by § 1367(c)(3). The Court, therefore, **DISMISSES** Plaintiff's claims for battery, assault, and IIED against Defendant Elder **without prejudice**.[7]

## CONCLUSION

With respect to Defendant Elder, the Court **GRANTS** his motion to dismiss, and it **DISMISSES** Plaintiff's unlawful seizure and excessive force claims against him **without prejudice** because he is not a state actor as required by § 1983. As for Plaintiff's remaining state law claims against Defendant Elder for battery, assault, and IIED, the Court **DECLINES** to exercise its supplemental jurisdiction and **DISMISSES** those claims **without prejudice** as well.[8]

Finally, as for Plaintiff's remaining § 1983 claims against Officer Chambers and Officer Woods, the body-cam footage tells the real version of the facts and shows that Plaintiff's Amended Complaint, with respect to those claims, easily falls into that

---

[7] "If a district court declines to exercise jurisdiction over a claim asserted under § 1367(a) and the plaintiff wishes to continue pursuing it, she must refile the claim in state court." *Artis v. District of Columbia*, 583 U.S. 71 (2018); *see also* 28 U.S.C. § 1367(d).

[8] In his motion to dismiss, Defendant Elder requested for the Court to "[a]ward [him] his costs of litigation," lost wages, travel expenses, defamation of character, emotional distress, and financial distress "in the sum of $5,000." [Doc. 39, p. 5]. To the extent Defendant Elder's request seeks attorney's fees, his request is **DENIED**. "[A] pro se litigant who is not a lawyer is not entitled to attorney's fees." *Kay v. Ehler*, 499 U.S. 432, 435–38 (1991). Similarly, with respect to his requests for lost wages, travel expenses, defamation of character, emotional distress, and financial distress, those are **DENIED** as well. Defendant Elder did not properly assert what appear to be counterclaims against Plaintiff as required by Rule 13. *See* Fed. R. Civ. P. 13(a). However, as a prevailing party, Defendant Elder may submit appropriate documents to recover costs after the Clerk of Court enters judgment. *See* Fed. R. Civ. P. 54(d)(1).

(e)(2)(B)(ii) category of required and automatic dismissals under § 1915 for an IFP litigant's case. That is, when a court determines "at any time" that an action "fails to state a claim on which relief may be granted." 28 U.S.C. § 1915(e)(2)(B)(ii). Accordingly, based on all of the foregoing and the rulings from the February Order, the Court **DIRECTS** the Clerk of Court to **ENTER JUDGMENT** against Plaintiff Miranda Whitworth and in favor of Officer Johnathon Tyler Chambers, Officer Danny Bryan Woods, and Defendant Jesse Elder. This case may be **CLOSED**. *See generally* [Doc. 35].

**SO ORDERED**, this 6th day of April, 2026.

*S/ Tilman E. Self, III*
**TILMAN E. SELF, III**
**UNITED STATES DISTRICT JUDGE**